FILED IN
COURT OF CRIMINAL APPEALS

August 4, 2015

ABEL ACOSTA, CLERK

AP-77,040
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 8/3/2015 4:58:09 PM
Accepted 8/4/2015 7:49:24 AM
ABEL ACOSTA
CLERK

CAUSE NO. <u>AP - 77,040</u>

IN THE

COURT OF CRIMINAL APPEALS OF TEXAS

CEDRIC ALLEN RICKS
Appellant
VS.
THE STATE OF TEXAS
Appellee

APPELLANT'S BRIEF

Appeal of Cause No. 1361004R
Out of the 371st Judicial District Court
of Tarrant County, Texas
The Hon. Mollee Westfall, Presiding

ORAL ARGUMENT IS NOT REQUESTED

MARY B. THORNTON
Attorney for Appellant
3901 Race Street
Fort Worth, Texas 76111
Telephone No.: (817) 759-0400
Telecopier No.: (817) 831-3002
marybrabson01@gmail.com
State Bar No. 19713700

Adam L. Arrington
Attorney at Law
1020 Macon Street, Suite 7
Fort Worth, Texas 76102
Telephone No.:  (817) 395-3674
Telecopier No.:  (682) 841-1399
State Bar No. 24085685

## IDENTITY OF PARTIES AND COUNSEL

The following is a complete list of all parties listed in the trial court's final

Judgment and their trial and appellate counsel pursuant to *Rule 38.1 (a) of the*

*Texas Rules of Appellate Procedure:*

1.    Cedric Allen Ricks
      TDCJ #00999593
      Allan B. Polunski Unit
      3872 FM 350 South
      Livingston, Texas 77351

2.    The Hon. William H. "Bill" Ray
      Attorney at Law/Appellant's Trial Counsel
      512 Main Street, Suite 308
      Fort Worth, Texas 76102

3.    The Hon. Steve Gordon
      Attorney at Law/Appellant's Trial Counsel
      2101 Moneda Street
      Fort Worth, Texas 76102

4.    The Hon. Sharen Wilson
      District Attorney of Tarrant County, Texas
      Fourth Floor of the Tim Curry Criminal Justice Center
      401 West Belknap
      Fort Worth, Texas 76196

5.    The Hon. Robert K. Gill
      Asst. Criminal District Attorney/State's Trial Counsel
      Tarrant County District Attorney's Office
      Fourth Floor of the Tim Curry Criminal Justice Center
      401 West Belknap

Fort Worth, Texas 76196

6.  **The Hon. Robert Huseman**
    **Asst. Criminal District Attorney/State's Trial Counsel**
    **Tarrant County District Attorney's Office**
    **Fourth Floor of the Tim Curry Criminal Justice Center**
    **401 West Belknap**
    **Fort Worth, Texas 76196**

7.  **The Hon. Debra Windsor**
    **Chief of Post Conviction**
    **Tarrant County District Attorney's Office**
    **Fourth Floor of the Tim Curry Criminal Justice Center**
    **401 West Belknap**
    **Fort Worth, Texas 76196**

## TABLE OF CONTENTS

                                                                    **PAGE**

IDENTITY OF PARTIES AND COUNSEL.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF CONTENTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .xi

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xxv

APPELLANT'S POINTS OF ERROR (ISSUES PRESENTED).. . . . . . . . . . . . . . . xxviii

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF APPELLANT'S ARGUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . 11

POINT OF ERROR ONE (ARGUMENT).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

THE TRIAL COURT ERRED IN DENYING
APPELLANT'S MOTION TO SUPPRESS ALL
EVIDENCE SEIZED BY LAW ENFORCEMENT
OFFICIALS SUBSEQUENT TO HIS
WARRANTLESS ARREST WHICH WAS IN
VIOLATION OF *THE FOURTH AND
FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION. (CR. I-284-
99; II-409; RR. VI-144-87, 231-41; XXXII-
71; XLII-SPTX 1, 2, 7, 8, 9, 10, 11; XLV-DX
1).*

POINT OF ERROR TWO (ARGUMENT). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

THE TRIAL COURT ERRED IN DENYING
APPELLANT'S MOTION TO SUPPRESS ALL

EVIDENCE SEIZED BY LAW ENFORCEMENT OFFICIALS SUBSEQUENT TO HIS WARRANTLESS ARREST WHICH WAS IN VIOLATION OF *ARTICLE 1, SECTION 9 OF THE TEXAS CONSTITUTION* AND *ARTICLES 1.06, 18.02, AND 38.23 OF THE TEXAS CODE OF CRIMINAL PROCEDURE. (CR. I-284-99; II-409; RR. VI-144-87, 231-41; XXXII-71; XLII-SPTX 1, 2, 7, 8, 9, 10, 11; XLV-DX 1).*

**POINT OF ERROR THREE (ARGUMENT)..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**27**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE SEIZED BY LAW ENFORCEMENT OFFICIALS SUBSEQUENT TO THE WARRANTLESS SEARCH OF HIS APARTMENT WHICH WAS IN VIOLATION OF THE *FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. (CR. I-284-99; II-409; RR. VI-74-117, 231-41; XXXII-71; XLII-SPTX 1).*

**POINT OF ERROR FOUR (ARGUMENT)..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**27**

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE SEIZED BY LAW ENFORCEMENT OFFICIALS SUBSEQUENT TO THE WARRANTLESS SEARCH OF HIS APARTMENT WHICH WAS IN VIOLATION OF *ARTICLE I, SECTION 9 OF THE TEXAS CONSTITUTION AND ARTICLES 1.06, 18.02, AND 38.23 OF THE TEXAS CODE OF*

*CRIMINAL PROCEDURE. (CR. I-284-99; II-409; RR. VI-74-117, 231-41; XXXII-71; XLII-SPTX 1).*

POINT OF ERROR FIVE (ARGUMENT).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE SEIZED BY LAW ENFORCEMENT OFFICIALS BECAUSE APPELLANT WAS DENIED HIS RIGHT TO COUNSEL IN VIOLATION OF *THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. (CR. I-284-99; RR. VI-120-43, 188-228, XLII-SPTX3, SPTX4, SPTX5, & SPTX6).***

POINT OF ERROR SIX (ARGUMENT).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE SEIZED BY LAW ENFORCEMENT OFFICIALS BECAUSE APPELLANT WAS DENIED HIS RIGHT TO COUNSEL IN VIOLATION OF *ARTICLE I, SECTION 10 OF THE TEXAS CONSTITUTION AND ARTICLES 1.05, 15.17, AND 38.23 OF THE TEXAS CODE OF CRIMINAL PROCEDURE. (CR. I-284-99; RR. VI-120-43, 188-228, XLII-SPTX3, SPTX4, SPTX5, & SPTX6).***

POINT OF ERROR SEVEN.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL**

EVIDENCE SEIZED BY LAW ENFORCEMENT OFFICIALS BECAUSE APPELLANT WAS DENIED HIS RIGHT TO COUNSEL IN VIOLATION OF *OKLAHOMA STATUTES 22-251 AND 22-252. (CR. I-284-99; RR. VI-120-43, 188-228, XLII-SPTX3, SPTX4, SPTX5, & SPTX6).*

**POINT OF ERROR EIGHT.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ALLOWING THE STATE TO INTRODUCE SX225 AN AUTOPSY PHOTOGRAPH OF JAMES GONZALEZ'S BRAIN BECAUSE THE PREJUDICIAL EFFECT GREATLY OUTWEIGHED ANY PROBATIVE VALUE. *(RR. XXXII-113-16; XLIV-SX#225).*

**POINT OF ERROR NINE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ALLOWING THE STATE TO INTRODUCE SX226 AN AUTOPSY PHOTOGRAPH OF JAMES GONZALEZ'S BRAIN BECAUSE THE PREJUDICIAL EFFECT GREATLY OUTWEIGHED ANY PROBATIVE VALUE. *(RR. XXXII-113-16; XLIV-SX#226).*

**POINT OF ERROR TEN.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO DECLARE THE "10-12" RULE UNCONSTITUTIONAL ON THE GROUNDS THAT IT CREATES AN

IMPERMISSIBLE RISK OF ARBITRARY IMPOSITION OF THE DEATH PENALTY. *(CR. I-187-217; RR. V-79-80).*

POINT OF ERROR ELEVEN.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*ARTICLE 37.071 OF THE TEXAS CODE OF C R I M I N A L   P R O C E D U R E   IS* UNCONSTITUTIONAL BECAUSE IT FAILS TO PLACE THE BURDEN OF PROOF OF THE STATE REGARDING AGGRAVATING EVIDENCE. *(CR. I-142-46; RR. V-68).*

POINT OF ERROR TWELVE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO PRECLUDE THE IMPOSITION OF THE DEATH PENALTY ON GROUNDS THAT THE INDICTMENT FAILED TO CONTAIN ANY ALLEGATIONS REGARDING THE PUNISHMENT SPECIAL ISSUE. *(CR. I-142-46; RR. V-68).*

POINT OF ERROR THIRTEEN.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE APPLICATION OF TEXAS' DEATH PENALTY SCHEME BECAUSE IT HAS BEEN ARBITRARILY IMPOSED IN VIOLATION OF *THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. (Cr. I-147-50; RR. V-68-69).*

**POINT OF ERROR FOURTEEN.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

> THE TEXAS DEATH PENALTY STATUTE VIOLATES THE JURY TRIAL GUARANTEE OF *THE FOURTEENTH AMENDMENT,* AS INTERPRETED IN *APPRENDI V NEW JERSEY*, *RING V ARIZONA*, *BLAKELY V WASHINGTON*, *UNITED STATES V BOOKER*, AND *CUNNINGHAM V CALIFORNIA* BY FAILING TO PLACE UPON THE STATE THE BURDEN OF PROVING BEYOND A REASONABLE DOUBT A NEGATIVE ANSWER TO THE MITIGATION SPECIAL ISSUE. *(CR. I-142-46; RR. V-68).*

**POINT OF ERROR FIFTEEN.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

> APPELLANT'S RIGHTS UNDER *THE CONFRONTATION CLAUSE OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION* WERE VIOLATED WHEN THE MOTHER OF DECEDENT, ROSIE GONZALEZ, TESTIFIED TO INFORMATION PERTAINING TO AN EXTRANEOUS OFFENSE DURING THE PUNISHMENT STAGE OF HIS TRIAL. *(RR. XXXIV-25-28; XL-36-37, 66).*

**POINT OF ERROR SIXTEEN.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

> APPELLANT'S RIGHTS UNDER *THE CONFRONTATION CLAUSE OF ARTICLE 1, §10 OF THE TEXAS CONSTITUTION* WERE VIOLATED WHEN THE MOTHER OF DECEDENT ROSIE GONZALEZ TESTIFIED TO

INFORMATION PERTAINING TO AN EXTRANEOUS OFFENSE DURING THE PUNISHMENT STAGE OF HIS TRIAL. *(RR. XXXIV-25-28; XL-36-37, 66).*

**POINT OF ERROR SEVENTEEN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95**

REVERSIBLE ERROR OCCURRED WHEN THE MOTHER OF DECEDENT ROSIE GONZALEZ TESTIFIED TO INFORMATION PERTAINING TO AN EXTRANEOUS OFFENSE DURING THE PUNISHMENT STAGE OF HIS TRIAL IN VIOLATION OF THE HEARSAY RULE. *(RR. XXXIV-25-28).*

**POINT OF ERROR EIGHTEEN.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107**

THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED APPELLANT'S RIGHTS UNDER *THE CONFRONTATION CLAUSE OF THE UNITED STATES CONSTITUTION* BY PERMITTING THE SEXUAL ASSAULT NURSE EXAMINER TO TESTIFY TO STATEMENTS MADE BY ROSIE GONZALEZ REGARDING AN EXTRANEOUS OFFENSE ALLEGEDLY COMMITTED BY APPELLANT. *(RR. XXXV-11-20).*

**POINT OF ERROR NINETEEN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107**

THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED APPELLANT'S RIGHTS UNDER *ARTICLE 1, §10 OF THE TEXAS CONSTITUTION* BY PERMITTING THE SEXUAL ASSAULT NURSE EXAMINER TO

TESTIFY TO STATEMENTS MADE BY ROSIE GONZALEZ REGARDING AN EXTRANEOUS OFFENSE ALLEGEDLY COMMITTED BY APPELLANT. *(RR. XXXV-11-20).*

**POINT OF ERROR TWENTY**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

IF NONE OF APPELLANT'S POINTS OF ERROR ARE REVERSIBLE PER SE, THEN ALL OF THE ERRORS PRESENT CUMULATIVE ERROR REQUIRING REVERSAL WHEN CONSIDERED TOGETHER. *(Record in its entirety).*

**CONCLUSION AND PRAYER**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

**STATEMENT OF COMPLIANCE WITH RULE 9.4 (i)(2)(B)**. . . . . . . . . . . . . . . . 122

**CERTIFICATE OF SERVICE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

# INDEX OF AUTHORITIES

**CASES**                                                        **PAGE(S)**

Adams v Williams, 407 U.S. 143 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Amburgey v State, 696 N.E. 2d 44
    (Ind. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Anderson v State, 932 S.W. 3d 502
    (Tex. Crim. App. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Apprendi v New Jersey, 530 U.S. 466 (2000). . . . . . . . . . . . . . . 82,88,89,90,93

Avery v State, 359 S.W. 3d 230
    (Tex. Crim. App. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Baze v Rees, 553 U.S. 35 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Blakely v Washington, 542 U.S. 296 (2004). . . . . . . . . . . . 82,90,91,92,93,94

Bott v Bott, 962 S.W. 2d 626
    (Tex. App. - - Houston [14th
    Dist.] 1997, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

Boyce v State, No. 04-04-00267-CR
    (Tex. App. - - San Antonio,
    July 13, 2005) 2005 Tex.
    App. LEXIS 5395 (mem. op.). . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Brown v State, 974 S.W. 2d 289
    (Tex. App. - -  San Antonio
    1998, pet. ref'd). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118-19

Brown v State, 266 P. 476, 39 Okla. Crim. 406

(Okla. Crim. App. 1928). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Burdine v State, 719 S.W. 2d 309
(Tex. Crim. App. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Byers v State, 709 N.E. 2d 1024
(Ind. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

California v Brown, 479 U.S. 538 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

California v Cunningham, 127 S. Ct. 856 (2007). . . . . . . . . . . . . . . . . . . . . 92,93

Chamberlain v State, 998 S.W. 2d 230
(Tex. Crim. App. 1999) cert. denied,
528 U.S. 1082 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117-18

Chambers v Mississippi, 410 U.S. 284 (1973). . . . . . . . . . . . . . . . . . . . . . 100

Cobarrubio v State, 675 S.W. 2d 749
(Tex. Crim. App. 1983) overruled
in part, Lawrence v State, 700 S.W.
2d 208 (Tex. Crim. App. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Coolidge v New Hampshire, 403 U.S. 443 (1971). . . . . . . . . . . . . . . . . . . . . . 36

Corbett v State, 764 N.E. 2d 622
(Ind. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Crawford v Washington, 541 U.S. 36 (2004). . . . . . . . . . . . . . . . . . . . . . . . . 99

Davis v State, 268 S.W. 3d 683
(Tex. App. - - Fort Worth 2008,
pet. ref'd). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

Davis v United States, 512 U.S. 452 (1994). . . . . . . . . . . . . . . . . . . . . . . . . 50

De La Paz v State, 279 S.W. 3d 336
(Tex. Crim. App. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Derden v McNeel, 978 F. 2d 1453
(5th Cir. 1992) (en banc)
cert. denied, 508 U.S. 960 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

Duhart v State, 890 S.W. 2d 187
(Tex. App. - - Corpus Christi
1994, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Duncan v Louisiana, 391 U.S. 145 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Eddings v Oklahoma, 455 U.S. 104 (1982). . . . . . . . . . . . . . . . . . . . . . 68,69,75

Edwards v Arizona, 451 U.S. 477 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . 51,52

Elliott v State, 858 S.W. 2d 478
(Tex. Crim. App. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Ex parte Tucker, 973 S.W. 2d 950
(Tex. Crim. App. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Ex parte Welborn, 785 S.W. 2d 391
(Tex. Crim. App. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

Fetterly v Paskett, 997 F. 2d 1295
(9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Francis v Franklin, 471 U.S. 316 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . 70,71

Francis v State, 922 S.W. 2d 176
(Tex. Crim. App. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fuller v State, 829 S.W. 2d 191

(Tex. Crim. App. 1992) cert.
denied, 508 U.S. 941 (1993)....................................... 63

Furman v Georgia, 408 U.S. 238 (1972). ........................... 86-87

Gamboa v State, 296 S.W. 3d 574
(Tex. Crim. App. 2009). ....................................... 118

Garcia v State, 201 S.W. 2d 574
(Tex. Crim. App. 1948). ....................................... 100

Gigliobianco v State, 210 S.W. 3d 637
(Tex. Crim. App. 2006). ....................................... 62

Graham v Florida, 560 U.S. 48 (2010)............................... 70

Green v State, 899 S.W. 2d 245
(Tex. App. - - San Antonio
1995, no pet.). .............................................. 119

Gregg v Georgia, 428 U.S. 153 (1976)............................... 85

Gutierrez v State, 221 S.W. 3d 680
(Tex. Crim. App. 2007). ....................................... 33-34

Heitman v State, 815 S.W. 2d 681
(Tex. Crim. App. 1991). ....................................... 25

Hernandez v State, 726 S.W. 2d 53
(Tex. Crim. App. 1986). ....................................... 52

Horton v California, 496 U.S. 128 (1990). .......................... 36,37

In re Winship, 397 U.S. 358 (1970). ............................... 88-89

Jackson v Virginia, 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Jimenez v State, 32 S.W. 2d 233
    (Tex. Crim. App. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Johnson v State, 364 S.W. 3d 292
    (Tex. Crim. Appl. 2012) cert.
    denied, 133 S. Ct. 536 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Johnson v State, 912 S.W. 2d 227
    (Tex. Crim. App. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Jones v State, 119 S.W. 3d 766
    (Tex. Crim. App. 2003) cert.
    denied, 542 U.S. 905 (2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Jones v State, 833 S.W. 2s 118
    (Tex. Crim. App. 1992) cert.
    denied, 507 U.S. 921 (1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

Kansas v Marsh, 548 U.S. 163 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Katz v United States, 389 U.S. 347 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . 33

Kemper v State, 138 S.W. 1025
    overruled in part by Robertson v
    State, 142 S.W. 533 (Tex. Crim.
    App. 1911). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

Kennedy v Louisiana, 554 U.S. 407 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . 70

King v Federal Underwriters Exchange,
    144 Tex. 531, 191 S.W. 2d 1112
    (1946). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

King v State, 953 S.W. 2d 266
(Tex. Crim. App. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56,65

Klein v Sporting Goods, Inc., 772 S.W. 2d 173
(Tex. App. - - Houston [14th Dist.]
1989, writ denied).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

Kolb v State, 532 S.W. 2d 87
(Tex. Crim. App. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Kotteakos v United States, 328 U.S. 750 (1946). . . . . . . . . . . . . . . . . . . . 65-66

Langham v State, 305 S.W. 3d 568
(Tex. Crim. App. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Lawrence v State, 700 S.W. 2d 208
(Tex. Crim. App. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Lockett v Ohio, 438 U.S. 586 (1978). . . . . . . . . . . . . . . . . . . . . . . . 69-70,75

Long v State, 823 S.W. 2d 259
(Tex. Crim. App. 1991)
cert. denied, 505 U.S. 1224
(1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

McFarlane v State, 254 S.W. 2d 136
(Tex. Crim. App. 1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

McNeil v Wisconsin, 501 U.S. 171 (1991). . . . . . . . . . . . . . . . . . . . . . . . 50

Maldonado v State, 528 S.W. 2d 234
(Tex. Crim. App. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Maryland v Buie, 494 U.S. 325 (1990). . . . . . . . . . . . . . . . . . . . . . . 35,36,41

Massiah v United States, 377 U.S. 201 (1964)......................... 49

Mayberry v State, 830 S.W. 2d 176
    (Tex. Crim. App. 1992). ............................... 40

Miles v State, 357 S.W. 3d 629
    (Tex. Crim. App. 2011). ............................... 1

Miller v Alabama, 567 U.S. ___, 132 S. Ct. 2455
    (2012)............................................ 70

Miranda v Arizona, 384 U.S. 436 (1966). ........................ 50,57

Montejo v Louisiana, 556 U.S. 778 (2009). ..................... 49-50,51

Montgomery v State, 810 S.W. 2d 372
    (Tex. Crim. App. 1990). ........................... 62,63,65

Morris v State, 940 S.W. 2d 610
    (Tex. Crim. App. 1996). ............................... 70

Nash v State, 477 S.W. 2d 557
    (Tex. Crim. App.) cert. denied,
    409 U.S. 887 (1972).. ............................. 50,52

Narvaiz v State, 840 S.W. 2d 415
    (Tex. Crim. App. 1992) cert.
    denied, 507 U.S. 975 (1993).. ....................... 61

O'Neill v State, 681 S.W. 2d 663
    (Tex. App. - - Houston [1st Dist.]
    1984, pet. ref'd). ................................ 63

Payton v New York, 445 U.S. 573 (1980). ...................... 34

Pecina v State, 361 S.W. 3d 68
(Tex. Crim. App. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50,55

Penry v Lynaugh, 492 U.S. 302 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Perry v Jones, 506 F. 2d 778
(5th Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Perry v State, 158 S.W. 3d 438
(Tex. Crim. App. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Pitman v Lightfoot, 937 S.W. 2d 496
(Tex. App. - - San Antonio
1996, writ denied).. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  118

Pointer v Texas, 380 U.S. 400 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Polk v State, 224 P. 194, 26 Okla. Crim. 283
(Okla. Crim. App. 1924). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Powell v Alabama, 287 U.S. 45 (1932). . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Ramirez v State, 815 S.W. 2d 636
(Tex. Crim. App. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Rance v State, 815 S.W. 2d 633
(Tex. Crim. App. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Rayford v State, 125 S.W. 3d 521
(Tex. Crim. App. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Reasor v State, 12 S.W. 3d 813
(Tex. Crim. App. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-36

Reese v State, 33 S.W. 3d 238

(Tex. Crim. App. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Renn v State, 495 S.W. 2d 922
    (Tex. Crim. App. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  117

Ring v Arizona, 536 U.S. 584 (2002). . . . . . . . . . . . . . . . . . . . . . 81,89,90,93,94

Ritchie v State, 632 P. 2d 1244
    (Okla. Crim. App. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Rhodes v State, 945 S.W. 2d 115
    (Tex. Crim. App. cert. denied,
    552 U.S. 894 (1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Robinson v State, 693 N.E. 2d 548
    (Ind. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Runningwolf v State, 360 S.W. 3d 490
    (Tex. Crim. App. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Russell v State, 717 S.W. 2d 7
    (Tex. Crim. App. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Scales v State, 380 S.W. 3d 780
    (Tex. Crim. App. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Scales v State, No. 01-08-0932-CR
    (Tex. App. - - Houston [1st Dist.]
    April 14, 2011) (not designated
    for publication). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72,73,74,75

Scales v State, No. 01-08-0932-CR
    (Tex. App. - - Houston [1st Dist.]
    December 20, 2010) (not
    designated for publication). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Simmons v South Carolina, 512 U.S. 154 (1994).. . . . . . . . . . . . . . . . 70,71,75

Smerke v Office Equipment Co., 138 Tex. 236
     158 S.W. 2d 302 (1941). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

Smith v State, 894 S.W. 2d 876
     (Tex. App. - - Amarillo 1995,
     pet. ref'd). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

Spaziano v Florida, 468 U.S. 447 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Spencer v State, 703 N.E. 2d 1053
     (Ind. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Stahl v State, 749 S.W. 2d 826
     (Tex. Crim. App. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118,119

State v Dobbs, 323 S.W. 3d 184
     (Tex. Crim. App. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

State v Guzman, 959 S.W. 2d 632
     (Tex. Crim. App. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

State v Jennings, 958 S.W. 2d 930
     (Tex. App. - - Amarillo 1997,
     no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24,25

Strickland v Washington, 466  U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . 52

Sullivan v State, 564 S.W. 2d 698
     (Tex. Crim. App. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Taylor v State, 268 S.W. 3d 571
     (Tex. Crim. App. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

Terry v State, 491 S.W. 2d 161
(Tex. Crim. App. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Texas v Cobb, 532 U.S. 162 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Threadgill v State, 146 S.W. 3d 654
(Tex. Crim. App. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Tipton v State, 235 P. 259, 30 Okla. Crim. 56
(Okla. Crim. App. 1925). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

United States v Booker, 543 U.S. 220,
125 S. Ct. 738 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88,89,92

United States v Henry, 447 U.S. 264 (1980). . . . . . . . . . . . . . . . . . . . . . . . 49

United States v Munoz, 150 F. 3d 401
(5th Cir. 1979) cert. denied, 25
U.S. 1112 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

United States v Wade, 388 U.S. 218 (1967). . . . . . . . . . . . . . . . . . . . . . . . 49

Walter v United States, 447 U.S. 649 (1980). . . . . . . . . . . . . . . . . . . . . . . 37

West v State, 121 S.W. 3d 95
(Tex. App. - - Fort Worth 2003,
pet. ref'd). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

White v State, 729 S.W. 2d 737
(Tex. Crim. App. 1987) disavowed
in part, State v Dobbs, 323 S.W. 3d
184 (Tex. Crim. App. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37,38,39

Williams v State, 958 S.W. 2d 186
(Tex. Crim. App. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Willover v State, 70 S.W. 3d 841
(Tex. Crim. App. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  105

Wong Sun v United States, 371 U.S. 471 (1963). . . . . . . . . . . . . . . . . . . . . . 40,55

Woods v State, 152 S.W. 3d 121
(Tex. Crim. App. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Woods v State, 956 S.W. 2d 33
(Tex. Crim. App. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Wyatt v State, 23 S.W. 3d 18
(Tex. Crim. App. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Wyatt v Wolf, 324 P. 2d 548
(Okla. Crim. App. 1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56,57

Zuliani v State, 97 S.W. 3d 589
(Tex. Crim. App. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  104

# RULES, STATUTES, CONSTITUTIONS, LAW REVIEW ARTICLES, AND ATTORNEY GENERAL OPINIONS

Ind. Rule Evi. 403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Peggy M. Tobolowsky, "What Hath Penry Wrought?:
    Mitigating Circumstances and the Texas Death
    Penalty," 19 AMER. J. CRIM. L. 345 (1992). . . . . . . . . . . . . . . . . . . . . . 84

P.M. McClung, "Jury Charges for Texas Criminal
    Practice (rev. ed. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83-84

Tex. Const. art. I, §9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24,25,26,40

Tex. Const. art. I, §10. . . . . . . . . . . . . . . . . . . . . . . . . . . 52,79,100,116

Tex. Crim. Proc. Code Ann. art. 1.03
    (Vernon 1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Tex. Crim. Proc. Code Ann. art. 1.06
    (Vernon 1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Tex. Crim. Proc. Code Ann. art. 15.17
    (Vernon 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53,54,55,56

Tex. Crim. Proc. Code Ann. art. 18.02
    (Vernon 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Tex. Crim. Proc. Code Ann. art. 36.29
    (Vernon 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Tex. Crim. Proc. Code Ann. art. 37.071
    (Vernon 2009). . . . . . . . . . . . . . . . . . . xxvi,68,76,78,80,83,84,90,93

Tex. Crim. Proc. Code Ann. art. 38.23

(Vernon Supp. 2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25,39

Tex. Crim. Proc. Code Ann. art. 44.29 (a)
 (Vernon Supp. 2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41,120

Tex. Op. Att'y Gen. GA-0993 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Tex. Penal Code Ann. sec. 19.03 (a) (7) (A)
 (Vernon 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xxv

Tex. R. App. Proc. 33.1 (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Tex. R. App. Proc. 43.2 (d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

Tex. R. App. Proc. 44.2 (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41,80,101

Tex. R. App. Proc. 44.2 (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . 56,65,105

Tex. R. Evi. 103 (a) (1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Tex. R. Evi. 403.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61,62

Tex. R. Evi. 801.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

Tex. R. Evi. 802.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

U.S. Const., amend. IV.. . . . . . . . . . . . . . . . . . . . . . . . 24,25,26,33,34,40,41

U.S. Const., amend. V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50,51

U.S. Const., amend. VI. . . . . . . . . . . . 49,50,51,55,81,89,93,99,100,116,119

U.S. Const., amend. VIII.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83,87

U.S. Const., amend. XIV.. . . . . . . . . . . . . . . . . . 24,26,40,80,83,89,93,100,119

## STATEMENT OF THE CASE

The following is a concise statement of the nature of the case pursuant to *Rule 38.1 (d) of the Texas Rules of Appellate Procedure:*

Appellant, CEDRIC ALLEN RICKS, was charged by indictment, returned on February 24, 2014,[1] with the offense of capital murder (two murders during the same criminal transaction). *Tex. Penal Code Ann. sec. 19.03 (a) (7) (A) (Vernon 2011). (CR. I-11).* On May 5, 2014, Appellant pleaded not guilty to the State's indictment before a jury. *(RR. XXXI-16-17).* Two days later, on May 7, 2014, after hearing evidence from both the State and the defense, the jury found Appellant guilty of capital murder as charged in the State's indictment. *(CR. II-526-29; RR. XXXIII-71-73).* After hearing additional testimony from witnesses called by both sides, the jury answered Special Issue Number One (that there is a reasonable probability that Appellant would commit criminal acts of violence that would constitute a continuing threat to society) "yes" and Special Issue Number Two (whether there is a sufficient mitigating circumstance or circumstances to warrant a sentence of life imprisonment) "no." *(CR. II-527; RR.*

---

[1]This was a reindictment of cause number 1325203D which was returned on July 23, 2013. *(CR. I-20).*

*XL-134-40).* Commensurate with the jury's answers to the two special issues, on May 16, 20914, the trial court sentenced Appellant to death by lethal injection. *Tex. Crim. Proc. Code Ann. art. 37.071 §2 (g) (Vernon 2009). (CR. II-526-29; RR. XL-136-37).* On that same day, Appellant filed a notice of appeal; however, his conviction of capital murder and sentence of death were automatically appealed to the Texas Court of Criminal Appeals in Austin, Texas. *(CR. II-531).*

CAUSE NO. <u>AP - 77,040</u>

| | | |
|---|---|---|
| CEDRIC ALLEN RICKS | * | IN THE COURT OF |
| | * | |
| | * | |
| VS. | * | CRIMINAL APPEALS |
| | * | |
| THE STATE OF TEXAS | * | IN AUSTIN, TEXAS |

---

## APPELLANT'S BRIEF

---

Appeal of Cause No. 1361004R
Out of the 371st Judicial District Court
of Tarrant County, Texas
The Hon. Mollee Westfall, Presiding

---

TO THE HONORABLE JUDGES OF SAID COURT:

COMES NOW, CEDRIC ALLEN RICKS, hereinafter referred to as Appellant by and through his attorney, MARY B. THORNTON, and respectfully submits his appellate brief specifying twenty points of error pursuant to *Rules 71 and 38 of the Texas Rules of Appellate Procedure.*

## APPELLANT'S POINTS OF ERROR
## (ISSUES PRESENTED)

### POINT OF ERROR ONE

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE SEIZED BY LAW ENFORCEMENT OFFICIALS SUBSEQUENT TO HIS WARRANTLESS ARREST WHICH WAS IN VIOLATION OF *THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. (CR. I-284-99; II-409; RR. VI-144-87, 231-41; XXXII-71; XLII-SPTX 1, 2, 7, 8, 9, 10, 11; XLV-DX 1).*

### POINT OF ERROR TWO

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE SEIZED BY LAW ENFORCEMENT OFFICIALS SUBSEQUENT TO HIS WARRANTLESS ARREST WHICH WAS IN VIOLATION OF *ARTICLE 1, SECTION 9 OF THE TEXAS CONSTITUTION* AND *ARTICLES 1.06, 18.02, AND 38.23 OF THE TEXAS CODE OF CRIMINAL PROCEDURE. (CR. I-284-99; II-409; RR. VI-144-87, 231-41; XXXII-71; XLII-SPTX 1, 2, 7, 8, 9, 10, 11; XLV-DX #1).*

### POINT OF ERROR THREE

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE SEIZED BY LAW ENFORCEMENT OFFICIALS SUBSEQUENT TO THE WARRANTLESS SEARCH OF HIS APARTMENT WHICH WAS IN VIOLATION OF THE *FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. (CR. I-284-99; II-409; RR. VI-74-117, 231-41; XXXII-71; XLII-SPTX 1).*

### POINT OF ERROR FOUR

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE SEIZED BY LAW ENFORCEMENT OFFICIALS SUBSEQUENT TO THE WARRANTLESS SEARCH OF HIS APARTMENT WHICH WAS IN VIOLATION OF *ARTICLE I, SECTION 9 OF THE TEXAS CONSTITUTION AND ARTICLES 1.06, 18.02, AND 38.23 OF THE TEXAS CODE OF CRIMINAL PROCEDURE. (CR. I-284-99; II-409; RR. VI-74-117, 231-41; XXXII-71; XLII-SPTX 1).*

### POINT OF ERROR FIVE

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE SEIZED BY LAW ENFORCEMENT OFFICIALS BECAUSE APPELLANT WAS DENIED HIS RIGHT TO COUNSEL IN VIOLATION OF *THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE*

*UNITED STATES CONSTITUTION. (CR. I-284-99; RR. VI-120-43, 188-228, XLII-SPTX3, SPTX4, SPTX5, & SPTX6).*

## POINT OF ERROR SIX

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE SEIZED BY LAW ENFORCEMENT OFFICIALS BECAUSE APPELLANT WAS DENIED HIS RIGHT TO COUNSEL IN VIOLATION OF *ARTICLE I, SECTION 10 OF THE TEXAS CONSTITUTION AND ARTICLES 1.05, 15.17, AND 38.23 OF THE TEXAS CODE OF CRIMINAL PROCEDURE. (CR. I-284-99; RR. VI-120-43, 188-228, XLII-SPTX3, SPTX4, SPTX5, & SPTX6).*

## POINT OF ERROR SEVEN

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE SEIZED BY LAW ENFORCEMENT OFFICIALS BECAUSE APPELLANT WAS DENIED HIS RIGHT TO COUNSEL IN VIOLATION OF *OKLAHOMA STATUTES 22-251 AND 22-252. (CR. I-284-99; RR. VI-120-43, 188-228, XLII-SPTX3, SPTX4, SPTX5, & SPTX6).*

## POINT OF ERROR EIGHT

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ALLOWING THE STATE TO INTRODUCE SX225 AN AUTOPSY

**xxx**

PHOTOGRAPH OF JAMES GONZALEZ'S BRAIN BECAUSE THE PREJUDICIAL EFFECT GREATLY OUTWEIGHED ANY PROBATIVE VALUE. *(RR. XXXII-113-16; XLIV-SX#225).*

## POINT OF ERROR NINE

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ALLOWING THE STATE TO INTRODUCE SX226 AN AUTOPSY PHOTOGRAPH OF JAMES GONZALEZ'S BRAIN BECAUSE THE PREJUDICIAL EFFECT GREATLY OUTWEIGHED ANY PROBATIVE VALUE. *(RR. XXXII-113-16; XLIV-SX#226).*

## POINT OF ERROR TEN

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO DECLARE THE "10-12" RULE UNCONSTITUTIONAL ON THE GROUNDS THAT IT CREATES AN IMPERMISSIBLE RISK OF ARBITRARY IMPOSITION OF THE DEATH PENALTY. *(CR. I-187-217; RR. V-79-80).*

## POINT OF ERROR ELEVEN

*ARTICLE 37.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE IS* UNCONSTITUTIONAL BECAUSE IT FAILS TO PLACE THE BURDEN OF PROOF ON THE STATE REGARDING AGGRAVATING EVIDENCE. *(CR. I-142-46; RR. V-68).*

## POINT OF ERROR TWELVE

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO PRECLUDE THE IMPOSITION OF THE DEATH PENALTY ON GROUNDS THAT THE INDICTMENT FAILED TO CONTAIN ANY ALLEGATIONS REGARDING THE PUNISHMENT SPECIAL ISSUE.** *(CR. I-142-46; RR. V-68).*

## POINT OF ERROR THIRTEEN

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE APPLICATION OF TEXAS' DEATH PENALTY SCHEME BECAUSE IT HAS BEEN ARBITRARILY IMPOSED IN VIOLATION OF** *THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. (CR. I-147-50; RR. V-68-69).*

## POINT OF ERROR FOURTEEN

**THE TEXAS DEATH PENALTY STATUTE VIOLATES THE JURY TRIAL GUARANTEE OF** *THE FOURTEENTH AMENDMENT,* **AS INTERPRETED IN** *APPRENDI V NEW JERSEY, RING V ARIZONA, BLAKELY V WASHINGTON, UNITED STATES V BOOKER,* **AND** *CUNNINGHAM V CALIFORNIA* **BY FAILING TO PLACE UPON THE STATE THE BURDEN OF PROVING BEYOND A REASONABLE DOUBT A NEGATIVE ANSWER TO THE MITIGATION SPECIAL ISSUE.** *(CR. I-*

*142-46; RR. V-68).*

### POINT OF ERROR FIFTEEN

**APPELLANT'S RIGHTS UNDER** *THE CONFRONTATION CLAUSE OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION* **WERE VIOLATED WHEN THE MOTHER OF DECEDENT, ROSIE GONZALEZ, TESTIFIED TO INFORMATION PERTAINING TO AN EXTRANEOUS OFFENSE DURING THE PUNISHMENT STAGE OF HIS TRIAL.** *(RR. XXXIV-25-28; XL-36-37, 66).*

### POINT OF ERROR SIXTEEN

**APPELLANT'S RIGHTS UNDER** *THE CONFRONTATION CLAUSE OF ARTICLE 1, §10 OF THE TEXAS CONSTITUTION* **WERE VIOLATED WHEN THE MOTHER OF DECEDENT ROSIE GONZALEZ TESTIFIED TO INFORMATION PERTAINING TO AN EXTRANEOUS OFFENSE DURING THE PUNISHMENT STAGE OF HIS TRIAL.** *(RR. XXXIV-25-28; XL-36-37, 66).*

### POINT OF ERROR SEVENTEEN

**REVERSIBLE ERROR OCCURRED WHEN THE MOTHER OF DECEDENT ROSIE GONZALEZ TESTIFIED TO INFORMATION PERTAINING TO AN EXTRANEOUS OFFENSE DURING THE PUNISHMENT STAGE OF HIS TRIAL IN VIOLATION OF THE HEARSAY**

RULE. *(RR. XXXIV-25-28).*

### POINT OF ERROR EIGHTEEN

**THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED APPELLANT'S RIGHTS UNDER *THE CONFRONTATION CLAUSE OF THE UNITED STATES CONSTITUTION* BY PERMITTING THE SEXUAL ASSAULT NURSE EXAMINER TO TESTIFY TO STATEMENTS MADE BY ROSIE GONZALEZ REGARDING AN EXTRANEOUS OFFENSE ALLEGEDLY COMMITTED BY APPELLANT.** *(RR. XXXV-11-20).*

### POINT OF ERROR NINETEEN

**THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED APPELLANT'S RIGHTS UNDER *ARTICLE 1, §10 OF THE TEXAS CONSTITUTION* BY PERMITTING THE SEXUAL ASSAULT NURSE EXAMINER TO TESTIFY TO STATEMENTS MADE BY ROSIE GONZALEZ REGARDING AN EXTRANEOUS OFFENSE ALLEGEDLY COMMITTED BY APPELLANT.** *(RR. XXXV-11-20).*

### POINT OF ERROR TWENTY

**IF NONE OF APPELLANT'S POINTS OF ERROR ARE REVERSIBLE PER SE, THEN ALL OF THE ERRORS PRESENT CUMULATIVE ERROR REQUIRING REVERSAL WHEN CONSIDERED TOGETHER.** *(Record in its entirety).*

## STATEMENT OF FACTS

The following is a recitation of the facts of the case presented by the State of Texas during the guilt/innocence phase of Appellant's trial before a jury pursuant to *Rule 38.1 (f) of the Texas Rules of Appellate Procedure:*

Appellant, CEDRIC ALLEN RICKS, was convicted of the capital murder of his live-in girlfriend and her eight-year-old son by a previous marriage. The offense occurred on May 1, 2013, in Bedford, Tarrant County, Texas during the same criminal transaction. The legal sufficiency of the evidence to support his conviction is not challenged. The following factual summation[2] is an overview of the evidence adduced at Appellant's trial. Specific details concerning facts and testimony relevant to a prospective point of error will be summarized and discussed in the Argument and Authorities portion as they relate to the legal contention asserted.

---

[2]The evidence will be summarized in the proper standard of review for legal sufficiency of the evidence questions which is "the light most favorable to the verdict." *See, Jackson v Virginia*, 443 U.S. 307, 319 (1979); *Johnson v State*, 364 S.W. 3d 292, 293-94 (Tex. Crim. App. 2012) cert denied, 133 S. Ct. 536 (2012); *Runningwolf v State*, 360 S.W. 3d 490, 494 (Tex. Crim. App. 2012); *Avery v State*, 359 S.W. 3d 230, 236 (Tex. Crim. App. 2012); *Miles v State*, 357 S.W. 3d 629, 631 (Tex. Crim. App. 2011).

In May of 2013, twelve-year-old Damien Gonzalez[3] lived with his mother, thirty-year-old Rosie Gonzalez,[4] his brother, eight-year-old James Gonzalez,[5] his half-brother, nine-month-old baby Thomas,[6] and his mother's boyfriend and father of Thomas, Appellant. *(RR. XXXI-61; XXXII-16-20; XL-66-69).* The five members of the household resided in an apartment complex in Bedford, Tarrant County, Texas. *(RR. XXXI-28-36, 77; XXXII-18-19).* May 1, 2013, dawned as a typical day for the Gonzalez family and Appellant. *(RR. XXXII-20-24).* That evening after work[7] Rosie picked up her three boys and took them to Wal-Mart to shop for groceries. *(RR. XXXII-20-21).* Damien and James helped their mother unload the groceries and carry them upstairs to their apartment. *(RR. XXXII-20-22).* Once inside, Damien and James played with baby Thomas while Rosie retrieved the remainder of the bags from her vehicle and then began preparing dinner. *(RR. XXXII-22-24).*

---

[3]Damien Gonzalez is a pseudonym.

[4]Rosie Gonzalez is a pseudonym.

[5]James Gonzalez is a pseudonym.

[6]Thomas is a pseudonym.

[7]Both Rosie and Appellant worked in the medical field for various doctors. *(RR. XXXIV-7).*

Matt Webb also resided at the same apartment complex on May 1, 2013. *(RR. XXXI-42-43).* He arrived home at around 6:00 that evening; he left about an hour later to go out to dinner. *(RR. XXXI-43-44).* As he walked along the corridor towards his vehicle he heard a man's voice yelling and screaming expletives. *(RR. XXXI-44).* As he approached the man he recognized his neighbors Rosie Gonzalez and Appellant. *(RR. XXXI-44-46).* Rosie, who was carrying a couple of bags of groceries, appeared distraught. *(RR. XXXI-45).* As he passed them, Mr. Webb nodded and continued on his way. *(RR. XXXI-45).* While at dinner he received numerous texts, voice mails, and Facebook messages about a domestic situation that had recently taken place near his apartment. *(RR. XXXI-46-47).* He later provided the police with a statement detailing what he had witnessed earlier that evening. *(RR. XXXI-47).*

Around this same time Damien and James were having a great time playing in their shared bedroom with baby Thomas. *(RR. XXXII-22-23).* While the two older boys threw a tennis ball around their room their mother was in the kitchen preparing their supper. *(RR. XXXII-23-24).* At one point Damien became aware that Appellant and his mother were engaged in a heated verbal argument. *(RR. XXXII-24-25).* As the boys continued their play they heard their mother

3

abruptly scream. *(RR. XXXII-25).*  Both boys bolted from their room towards the sound. *(RR. XXXII-25-26).*  Damien watched as his mother and Appellant were striking each other with their fists. *(RR. XXXII-26).*  Stunned, Damien observed Appellant throw his mother to the living room floor. *(RR. XXXII-27).*  When Damien and James tried to intervene, Appellant threw Damien to the floor.[8] *(RR. XXXII-27-28).*  While both boys begged Appellant to stop, Appellant proceeded to strike Rosie multiple times with his fists. *(RR. XXXII-27-28).*  He then walked into the kitchen and procured a knife from a kitchen drawer. *(RR. XXXII-28-29).*  Her sons watched in horror as he walked back to Rosie and stabbed her multiple times. *(RR. XXXII-29-31).*  She futilely attempted to ward off the blows. *(RR. XXXII-30-31).*

Soon after Appellant began his attack on his mother, Damien ran back to his room and hid in his closet. *(RR. XXXII-31-32).*  He attempted to dial 9-1-1 on his cell phone while fighting Appellant's efforts to open the closet door. *(RR. XXXII-32-33).*  When Appellant finally wrestled the door open Damien dropped his phone and grabbed the knife that was in Appellant's hand. *(RR. XXXII-33-34).*

---

[8]During this time Damien was unsure what was happening to James. *(RR. XXXII-27).*

Bleeding profusely from his left hand Damien ran back into the living room. *(RR. XXXII-34-35).* James, his face covered in blood, told Damien to get help. *(RR. XXXII-35).*

Appellant abruptly pushed Damien down, held his head to the floor, and began stabbing him in the back of his neck and head. *(RR. XXXII-36-37).* Damien watched as Appellant did the same to James. *(RR. XXXII-37-39).* Appellant ceased his attack and began walking around the living room area. *(RR. XXXII-39).* After a few minutes Damien tried to stand. *(RR. XXXII-39).* Appellant walked over and resumed the knife attack. *(RR. XXXII-39-40).* When Damien feigned a gurgling noise, Appellant ended the assault.[9] *(RR. XXXII-40-41).* Feigning death, Damien listened as Appellant moved about the apartment. *(RR. XXXII-41-42).* Appellant took a shower, changed his clothes, made some telephone calls, packed a bag, and left, driving away in Rosie's gray Nissan automobile. *(RR. XXXII-42-47).*

---

[9]Damien testified that he had emulated the same sound that James had made when Appellant was stabbing him. When James had gurgled in his own blood because his breathing was obstructed, Appellant had stopped stabbing him. Damien was hoping that Appellant would also stop his attack on him. *(RR. XXXII-41, 161-62).*

5

Chicago transplant and Appellant's first cousin,[10] Janiece Taylor,[11] taught in the Arlington Independent School District at the time of her testimony. *(RR. XXXI-58).* Her parents, James and Lucinda Jones,[12] resided in Mansfield. *(RR. XXXI-58).* Janiece and Appellant grew up together in south Chicago. *(RR. XXXI-59-60).*

During the early evening hours of May 1, 2013, Janiece was at her parents' house in Mansfield.[13] Her telephone rang. *(RR. XXXI-63).* Recognizing the number as Appellant's she initially ignored his call.[14] *(RR. XXXI-63-64).* When his calls persisted she relented and answered her phone. *(RR. XXXI-64).* On the other end Appellant cried, "I - - - I did something bad." *(RR. XXXI-64).* Janiece began to sob, and Appellant asked to speak to his Uncle James. *(RR. XXXI-64).*

---

[10]Appellant's mother and Janiece's father are sister and brother. *(RR. XXXI-59-60).*

[11]Janiece Taylor is a pseudonym.

[12]James and Lucinda Jones are both pseudonyms.

[13]Janiece, her husband, her two sons, and her stepdaughter were living with her parents temporarily because she was in the process of having a home built. *(RR. XXXI-62-63).*

[14]Janiece explained that when Appellant called she did not answer because of time constraints. She intended to return his call at a later time when she had sufficient time to talk with him. *(RR. XXXI-63-64).*

She handed the phone to her father and watched his face contort in shock and dismay as he listened to Appellant. *(RR. XXXI-64-66).* Appellant confessed to his uncle that he had killed Rosie and her two boys. *(RR. XXXI-77-78).* Appellant requested that Janiece and her parents drive to his apartment to pick up baby Thomas. *(RR. XXXI-68, 78).* When Janiece spoke with Appellant again she urged him to turn himself in to the police. *(RR. XXXI-68).*

When she hung up from Appellant a second time, Janiece and her parents got into their car and began driving towards Appellant's apartment. *(RR. XXXI-69).* While on the way Janiece called 9-1-1. *(RR. XXXI-69).* A few minutes later a Bedford police officer contacted her and requested that the family divert to the Bedford Police Department. *(RR. XXXI-69-70).* Once there the three family members provided the authorities with information enabling them to locate Appellant. *(RR. XXXI-70-71, 78-79, 152-54).* While at the police station Janiece was relieved to learn that Appellant had been taken into custody. *(RR. XXXI-71).*

Bedford police officer Clayton Baxley received a dispatch at 8:42 p.m. on May 1, 2013, ordering him to proceed to Appellant's apartment to perform a welfare check. *(RR. XXXI-85-88).* He was the first responder on the scene. *(RR. XXXI-93).* When he approached the front door of the apartment he heard a baby

7

screaming inside. *(RR. XXXI-93).* As the officer waited for permission to enter, he learned that Damien had contacted the police. *(RR. XXXI-93-94, 110-13).* Damien had told the 9-1-1 operator that his mother and brother were deceased, his infant brother was screaming, and Appellant had perpetrated the offense. *(RR. XXXI-93-94).*

Within minutes Officer Baxley received permission to enter the apartment. *(RR. XXXI-94).* Due to the injuries to his hands Damien was unable to open the front door and called out for the officer to enter. *(RR. VI-6; XXXI-94).* When Officer Baxley stepped inside he observed Damien covered in blood from his head to his toes. *(RR. XXXI-95).* Upon closer inspection he could see severe lacerations to the back of the child's head, neck, and shoulders, and blood was flowing rapidly from his wounds. *(RR. XXXI-95-96).* The officer began talking to Damien while waiting for back up and the paramedics. *(RR. XXXI-96).* After Lieutenant Meaders arrived the two began a "protective sweep" of the apartment for other victims as well as Appellant. *(RR. XXXI-96-97).*

During their search Officer Baxley observed Rosie's and James' lifeless bodies lying on the living room floor. *(RR. XXXI-97).* They then found baby Thomas in a back room of the apartment uninjured. *(RR. XXXI-97).* Back outside

8

Officer Baxley held the flashlight while the paramedics tended to Damien's wounds. *(RR. XXXI-97-104).* Eventually Damien was transported to Cook Children's Hospital for life saving medical treatment. *(RR. XXXI-104-06).*

Heath E. Green was a Trooper employed by the State of Oklahoma at the time of his testimony. *(RR. XXXI-125).* On May 1, 2013, Trooper Green and his associate, Tracy Laxton, were assigned to patrol the southern end of Oklahoma in Garvin and Murray counties. *(RR. XXXI-126-27).* On that date they were working the "hoot" or midnight shift. *(RR. XXXI-127).* Later that night the troopers received a dispatch that Rosie Gonzalez's gray Nissan was traveling along the I-35 interstate and that the occupant of the vehicle was wanted for questioning in a stabbing incident. *(RR. XXXI-127-29, 133).* The troopers were provided with Appellant's name, the color of the vehicle, the license plate number, and the location of Appellant's cell phone. *(RR. XXXI-127-29).* Troopers Green and Laxton pulled out in their separate vehicles and promptly located the Nissan at the sixty-eight mile marker on northbound I-35. *(RR. XXXI-127-31).* Appellant was eventually placed under arrest. *(RR. XXXI-133-38).*

Back at Appellant's apartment the police investigation continued. *(RR. XXXI-182-253, 284-305).* Various search warrants were obtained for the

apartment[15], Rosie's car, and eventually Appellant's DNA. *(RR. XLII-SPTX1, SPTX2, SPTX7, SPTX9, & SPTX10).* Crime scene officers carefully combed the apartment for evidence. *(RR. XXXI-182-255, 284-307).* Several knives containing biological material were seized. *(RR. XXXI-255).* Testing found the DNA of Damien, Rosie, James, and Appellant on various items, including the knives. *(RR. XXXIII-11-24).*

Dr. Tasha Greenberg, Deputy Medical Examiner for the Tarrant County District Attorney's Officer performed the autopsies on Rosie and James Gonzalez. *(RR. XXXII-109-11).* She concluded that Rosie died of stab wounds of the neck, blunt force injuries of the head, and asphyxia as a combination and that her manner of death was a homicide. *(RR. XXXII-113-50).* James died as a result of stab wounds to the head and neck, and his manner of death was also a homicide. *(RR. XXXII-151-77).* Appellant was eventually indicted for the offense of capital murder. *(CR. I-11).*

---

[15]Appellant challenges the Federal and State constitutionality of this search in points of error three and four because it was conducted hours before the actual search warrant was obtained.

## SUMMARY OF APPELLANT'S ARGUMENTS

The following is a summary of Appellant's points of error on appeal pursuant to *Rule 38.1 (g) of the Texas Rules of Appellate Procedure:*

POINTS OF ERROR ONE AND TWO:

At the time of Appellant's actual stop by the Oklahoma state troopers, Appellant had committed no crime, and the troopers did not have probable cause to arrest him. Any evidence seized by law enforcement officials subsequent to Appellant's illegal arrest should have been suppressed. Therefore, Appellant's Motion to Suppress should have been granted in its entirety.

POINTS OF ERROR THREE AND FOUR:

Law enforcement officials began searching Appellant's apartment after the welfare check and exigent circumstances ceased to exist. They proceeded to locate and seize items of evidence inside his apartment hours before the search warrant was procured in violation of *the United States and Texas Constitutions* and requisite Texas statutes.

POINTS OF ERROR FIVE, SIX, AND SEVEN:

Shortly after Appellant's arrest he was taken before an Oklahoma

magistrate who arraigned him on his fugitive case (filed as a result of Appellant's refusal to waive extradition) and denied him counsel. Subsequent to his arraignment the local sheriff threw Appellant into a cell with other prisoners who beat him severely. Almost immediately afterwards Appellant waived extradition and returned to Texas. Appellant's denial of counsel violated *the United States and Texas Constitutions* as well as the Oklahoma statutes. As a result, his Motion to Suppress all evidence seized after his unlawful denial of counsel should have been granted.

POINTS OF ERROR EIGHT AND NINE:

The prejudicial effect of the two autopsy photographs of James Gonzalez's brain outweighed their probative value. As a result, reversible error resulted in their admission into evidence before the jury.

POINT OF ERROR TEN:

Appellant will argue that Texas defendants charged with capital murder are afforded lesser protections than are required by the *Constitution of the United States* and applied to non-death penalty defendants.

POINT OF ERROR ELEVEN:

By requiring the jurors to determine whether there are "sufficient. .

.mitigating circumstances," the second special issue implies that the burden to prove the mitigating circumstances of the case outweigh the aggravating circumstances is on the defense. This renders the statute unconstitutional under *the Eighth and Fourteenth Amendments to the United States Constitution.*

POINT OF ERROR TWELVE:

Appellant will argue that absent an allegation in the indictment as to the existence of the special issues and supporting facts the State intended to offer in support of those answers it was precluded from seeking the death penalty.

POINT OF ERROR THIRTEEN:

The thrust of this point is that the death penalty procedure in Texas violates the *Eighth Amendment to the United States Constitution.*

POINT OF ERROR FOURTEEN:

The Texas death penalty scheme violates *the Due Process Clause of the Fourteenth Amendment* because it does not put the burden of disproving the mitigation special issue beyond a reasonable doubt on the State in violation of the principles espoused in *Apprendi v New Jersey, Ring v Arizona, Blakely v Washington,* and *Cunningham v California.*

POINTS OF ERROR FIFTEEN, SIXTEEN, AND SEVENTEEN:

13

Rosie Gonzalez's mother was permitted to testify to damming and prejudicial statements allegedly made by Rosie that after the commission of an extraneous family violence assault against her Appellant had pressured her into a reconciliation in violation of *the Confrontation Clause of the United States and Federal Constitutions* as well as the hearsay rule.

POINTS OF ERROR EIGHTEEN AND NINETEEN:

The trial court committed reversible error by permitting the Sexual Assault Nurse Examiner to testify about alleged statements made by Rosie Gonzalez pertaining to an extraneous assault allegedly committed by Appellant against her. These statements violated Appellant's rights under *the Confrontation Clause of the Federal and State Constitutions.*

POINT OF ERROR TWENTY:

If this Court concludes than none of the above points of error constitute harm, then Appellant's conviction and death sentence should be reversed based on the cumulative error in the record.

## POINT OF ERROR ONE

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE SEIZED BY LAW ENFORCEMENT OFFICIALS SUBSEQUENT TO HIS WARRANTLESS ARREST WHICH WAS IN VIOLATION OF *THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. (CR. I-284-99; II-409; RR. VI-144-87, 231-41; XXXII-71; XLII-SPTX 1, 2, 7, 8, 9, 10, 11; XLV-DX 1).*

## POINT OF ERROR TWO

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE SEIZED BY LAW ENFORCEMENT OFFICIALS SUBSEQUENT TO HIS WARRANTLESS ARREST WHICH WAS IN VIOLATION OF *ARTICLE 1, SECTION 9 OF THE TEXAS CONSTITUTION* AND *ARTICLES 1.06, 18.02, AND 38.23 OF THE TEXAS CODE OF CRIMINAL PROCEDURE. (CR. I-284-99; II-409; RR. VI-144-87, 231-41; XXXII-71; XLII-SPTX 1, 2, 7, 8, 9, 10, 11; XLV-DX 1).*

## ARGUMENT AND AUTHORITIES

### A. The Facts

During the hearing on Appellant's Motion to Suppress all of the evidence

15

seized subsequent to his warrantless arrest, Trooper Laxton, one of the arresting officers out of Oklahoma, testified on direct examination as follows:

Q. Around 10:30 that night, where were you located?

A. Myself and Trooper Green was at the gas station right off exit 55 on I35, which is right on the Garvin/Murray County border. We had just went inside to take a short break.

Q. At 2258 hours, did you hear a broadcast over your police radio?

A. I did hear the broadcast. Let me check on the times. Yes.

\* \* \*

Q. What information did you receive over your police radio at that time?

A. This is kind of paraphrasing. I can't say it exactly, but basically that there was a vehicle - - a silver or gray vehicle northbound - - Nissan Altima northbound on I35, possibly had a driver in it named Cedric Ricks. The vehicle had a Texas tag of CP4-M829, and the suspect - - or the person that was supposedly driving the vehicle was wanted in questioning for a

16

stabbing that happened in Bedford, Texas.

\* \* \*

Q. And what did you and Trooper Green do at that time?

A. We immediately went to our cars. The original broadcast, I believe, was just south of us. So we figured, with the time delay, we jumped on the interstate and started north, and we just started north trying to - - he was in his car; I was in mine. He was just no more than a few hundred yards in front of me. We were running kind of tandem, running north on the interstate trying to locate that vehicle.

\* \* \*

Q. At some point, did either you or Trooper Green locate the vehicle?

A. Yes.

Q. And who located it first?

A. Trooper Green saw the vehicle first. He radioed back to me. I saw him hitting his brakes as he was slowing down, and he was telling me that he just passed - - or he just pulled up next to the vehicle. I was - - I seen it about the same time he was talking on the radio, but he saw it just right before I did.

17

* * *

Q. Did either you or Trooper Green immediately stop the vehicle at that time?

A. No.

Q. What did you do?

A. I radioed back to my dispatch, which is Ardmore Troop F, to ask - - or basically to tell them, "We've located the vehicle. Does Bedford or does - - Bedford PD, is they - - are they wanting the vehicle stopped or - - we've located, what do they want to do?

Q. So it was your understanding at that time that your dispatcher was in contact with this law enforcement agency that wants the vehicle stopped?

A. Yes. I'm - - the length of time from asking questions to getting answers, I'm pretty sure they were on the phone with somebody from Bedford, but I'm not sure who.

Q. Okay. And when you asked them that question and they told you what they told you, what did you do?

A. They said, "Yes, stop the vehicle." At that time, myself and Trooper Green both turned on our lights, all of our

18

emergency lighting at about the same time. He was actually - - actually, we waited just a few more seconds. When they said, "Yes, stop the vehicle," we were coming up on a bridge with guardrail. It's a crest of a hill. It's kind of an unsafe spot to pull anybody over. Right past this bridge, there's no guardrail. It opens up to just grass on both sides. So we waited a few seconds. As soon as we cleared the bridge, we turned on the lights to - - to start the traffic stop.

Q. How long would you say you followed the vehicle at the time you first observed it until the time you decided to stop it?

A. Approximately a mile, give or take a little bit. I don't - - about a mile. No more than a mile maybe, half a mile.

Q. And during that time, did you observe the vehicle - - the occupant of the vehicle make any traffic violations?

A. No.

Q. Was the vehicle speeding?

A. No, it was not.

Q. So when you stopped the vehicle, you did so at the direction of your dispatcher, correct?

19

A. Yes.

Q. Who was speaking to authorities in Texas - - law enforcement authorities in Texas, correct?

A. Yes.

Q. When you stopped the vehicle - - or excuse me. Let me back up. When you turned on your overhead lights, what did the driver of the vehicle do?

A. Immediately pulled to the right shoulder and stopped with the left tires within just a couple of inches of the white fog line.

*(RR. VI-146-51).*

However, on cross-examination the Trooper conceded that at the time he actually conducted the stop of Appellant not only had Appellant committed no traffic violations of any kind, but also he had no information that Appellant had committed any crime in any jurisdiction. The record reflects:

Q. [BY DEFENSE COUNSEL] And, Trooper Laxton, she'll show you that if you need to see it, but in Texas, we use the phrase "probable cause." You're familiar with that?

20

A.      Yes.

Q.      On those statutes, on arresting someone for a felony not in your view, Oklahoma chose to use "reasonable cause."  Y'all use that term a lot, right?

A.      Correct.

                    *      *      *

Q.      But here's what I'm getting at. And my question is not whether this is an arrest or detainment.  I'm not trying to argue about what is what.  I'm not trying to argue with you about what you did.  Okay? But what I'm getting at is:  At the time you chose to turn on your red and blue lights to initiate the traffic stop, all you knew was what you had been told by your dispatcher in two different conversations:  One, Mr. Ricks is wanted for questioning in a stabbing in Bedford, and the second one was a response, which was Bedford PD would like him stopped, correct?

A.      That's correct.

                    *      *      *

Q.      Well, did you -- did you feel like you had reasonable cause that the - - because the statute says you can make a stop for a felony, okay, if - - or you can arrest a person for a felony, is what it says,

21

if you have reasonable cause that a felony had been committed even if it wasn't in your view.  It's not exactly in that order, but that's what it says.  And my question is:  At that point in time, when you turned on the red and blue lights, did you believe that you had reasonable cause that Mr. Ricks had committed a felony?

A.    Counsel, I don't know if I'm overthinking this.  I mean, because there was more - - there was more questions asked and answered to get to the arrest point of it.

Q.    I understand that when you finally said, "You're under arrest," that was based on other conversations.  I'm not trying to argue about that.

My question is:  At the time you stopped him, you obviously didn't know all the conversations with Detective Moody and the other people.  I'm just talking about when they said, "Pull this car over."

A.    The information that I had - - I'm going to try to answer this as best I can, if I understand you right.  The information I had when I turned my lights on was not enough - - that just at its own was not enough for me to go through the whole entire stop, place Mr. Ricks under arrest, take him to jail, all the above.

22

Q.    You had to gain information after you stopped him?

A. Yes.  Is that what you're answering - -

Q.    Exactly.

A.    - - or asking, sir?  Yes.

(RR. VI-183-86).

The trial court granted Appellant's Motion to Suppress all of the evidence seized subsequent to his warrantless arrest as to a few items uncovered by law enforcement during their, Appellant later contends unlawful search, of Appellant's apartment prior to their procurement of a warrant.  In all other matters Appellant's Motion to Suppress was denied. *(CR. II-409).*  Defense counsel objected to the admission of all of the other items of evidence seized subsequent to Appellant's arrest and requested a running objection to all such evidence. *(RR. XXXII-71).*

B. <u>The Law Under the Federal and Texas Constitutions</u>

An investigative detention is a seizure. <u>*Francis v State*</u>*, 922 S.W. 2d 176, 178 (Tex. Crim. App. 1996);* <u>*Johnson v State*</u>*, 912 S.W. 2d 227, 235 (Tex. Crim. App. 1995).  As a result, it must be reasonable to meet the standards required*

by *the United States and Texas Constitutions. See, U.S. Const. amend. IV and XIV* as well as *Tex. Const. art. I §9.* An occupant of an automobile is just as subject to a brief detention as is a pedestrian. *Adams v Williams, 407 U.S. 143, 146 (1972); Rhodes v State, 945 S.W. 2d 115, 117 (Tex. Crim. App.) cert denied, 552 U.S. 894 (1997).* The reasonableness of a temporary detention must be examined in terms of the totality of the circumstances and will be justified when the detaining officer has specific articulable facts, which taken together with rational inferences from those facts, lead him to conclude that the person detained actually is, has been, or soon will be engaged in criminal activity. *Woods v State, 956 S.W. 2d 33, 38-39 (Tex. Crim. App. 1997).*

In *State v Jennings, 958 S.W. 2d 930, 932 (Tex. App. - - Amarillo 1997, no pet.)* a peace officer was dispatched to a domestic disturbance in the City of Plainview. *958 S.W. 2d at 932.* En route to the domestic disturbance call, she received a dispatch over her police radio describing a vehicle that was wanted for questioning in regards to the domestic disturbance. *Id.* The officer located and stopped the vehicle that matched the broadcast based solely on the fact that the driver of the vehicle was wanted for questioning in regards to the domestic disturbance. *Id.* On appeal, the Court of Appeals found that "the totality

24

of the circumstances evince only a request to stop coupled with a description of the vehicle to be stopped," and that "these circumstances alone are not enough to illustrate that the initial detention was justified on the basis of reasonable suspicion or probable cause." *Id at 933,* (citing *Rance v State, 815 S.W. 2d 633, 635 n. 2 (Tex. Crim. App. 1991)).*

*Art. I, §9 of the Tex. Const.* provides: "The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation." Pursuant to *Heitman v State, 815 S.W. 2d 681, 690 (Tex. Crim. App. 1991)* this Court, when analyzing and interpreting *art. I, §9 of the Tex. Const.,* will not be bound by Supreme Court decisions addressing the comparable *Fourth Amendment* issue. *The Tex. Const.* affords greater individual protections to its citizens in search and seizure cases than *the Fourth Amendment to the U.S. Const. See also, arts. 1.06, 18.02, and 38.23 Tex. Crim. Proc. Code Ann. (Vernon 1965, 2003, and Vernon Supp. 2004).*

In the case at bar, when the Trooper turned on his lights and sirens to

25

initiate his traffic stop of Appellant he admitted that he lacked reasonable suspicion and probable cause to believe that Appellant had committed any type of crime in any jurisdiction. *(RR. VI-185-86).* As a result Appellant's rights under *the Fourth and Fourteenth Amendments to the United States Constitution, art. I § 9 of the Tex. Const.,* and those under the enumerated state statutes were violated, and the trial court erred by denying Appellant's Motion to Suppress all of the evidence seized subsequent to his unlawful arrest.

This error is subject to harmless error review. Appellant contends that this Court must reverse the trial court's judgment of guilt unless this Court determines beyond a reasonable doubt that the error did not contribute to Appellant's conviction. Appellant believes that the State's admission of the instruments of the crime as well as all of the other numerous items of evidence that were seized as a result of the various search warrants contributed to the jury's verdict of guilt against him. Because of this Appellant respectfully prays that this Honorable Court sustain points of error one and two, reverse the Judgment of the trial court, and remand his case for a new trial.

## POINT OF ERROR THREE

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE SEIZED BY LAW ENFORCEMENT OFFICIALS SUBSEQUENT TO THE WARRANTLESS SEARCH OF HIS APARTMENT WHICH WAS IN VIOLATION OF THE *FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. (CR. I-284-99; II-409; RR. VI-74-117, 231-41; XXXII-71; XLII-SPTX 1).*

## POINT OF ERROR FOUR

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE SEIZED BY LAW ENFORCEMENT OFFICIALS SUBSEQUENT TO THE WARRANTLESS SEARCH OF HIS APARTMENT WHICH WAS IN VIOLATION OF *ARTICLE I, SECTION 9 OF THE TEXAS CONSTITUTION AND ARTICLES 1.06, 18.02, AND 38.23 OF THE TEXAS CODE OF CRIMINAL PROCEDURE. (CR. I-284-99; II-409; RR. VI-74-117, 231-41; XXXII-71; XLII-SPTX 1).*

## ARGUMENT AND AUTHORITIES

### A. The Facts

Bedford Detective, Joey Gauger, testified at the hearing on Appellant's

Motion to Suppress that when the responding officers initially entered the

27

apartment during the evening hours of May 1, 2013, to provide medical assistance to Damien, to rescue baby Thomas, and to check for survivors of the attack they had observed various items of evidence that would eventually need to be collected. *(RR. VI-83-84).* On direct examination Detective Gauger then described entering Appellant's apartment after both the exigent and welfare check circumstances had officially terminated and before a warrant to search the premises had been procured. The record states in pertinent part as follows:

> Q. And had you learned, at least upon arrival or en route, that certain items of evidence had been discovered by the initial responding officers?
>
> A. Once I arrived on the scene and - - and had that conversation with Crime Scene Technician Grice, I learned that there was evidence that had been observed by the initial responding officers.
>
> Q. And do you recall what time you entered into the apartment, the crime scene?
>
> A. I don't - - I don't recall the exact time, but I do believe it was around 11:18 p.m.
>
> Q. Okay. And when you entered the apartment, what did you do?

A.      I began to assist Crime Scene Grice with taking notes prospective to the evidence that was collected.

Q.      Was she also taking photographs?

A.      Yes, she was.

Q.      While you were in the crime scene, did personnel from the Tarrant County Medical Examiner's Office arrive inside the apartment?

A.      Yes, they did.   Considerable time after I had been in the apartment, they did arrive.

Q.      Do you recall what time it was?

A.      I believe at 3:38 a.m. on the 2nd of May.

Q.      And why did they come to the scene?

A.      They -- they arrived on scene to transport - - have the bodies transported from the scene to the ME's office.

Q.      While you were out there, did you hear an investigator for the Tarrant County Medical Examiner's Office make any comments regarding potential murder weapons?

A.     Yes, he did.

Q.     What happened?

A.     He - - he - -he told me that he - - or he summoned me and said, "Hey, I found a knife in the second drawer of the kitchen, and there's some blood on the knife."  I said, "Okay."  And I went over there, and I looked.  The drawer was cracked open about two and a half inches, and you could see a knife in the drawer that had blood on it.

Q.     Okay.     And     it's     your understanding that the drawer was already open when the medical examiner investigator observed the bloody knife; is that correct?

A.     Yes, it was.

Q.     And what did you do at that time?

A.     At that time, I notified Crime Scene Technician Grice of the knife so she could document and collect the knife and take photographs of it.

Q.     And did the medical examiner investigator - - did he continue his duties and eventually complete those duties?

A.     Yes, he did.

30

Q.     What did you do next?

A.     After he finished his duties, then I exited the crime scene. There was one point in the crime scene I did take a video of the crime scene.

Q.     Do you know what time you left the crime scene?

                    *     *     *

A.     I left at - - from the crime scene log, I left the crime scene at 1:22 a.m. and returned at 1:45 a.m. on May 2nd.

Q.     Okay. But you left the crime scene after the medical examiner's office left; is that correct?

A.     Yes, I did. I left right at about the same time, which was at 4:38 a.m. on May 2nd.

Q.     So you - - when you originally left the scene, you left to retrieve some items, correct?

A.     Yes. I left the scene to retrieve the - - the police department crime scene video camera.

Q.     Okay. Then you returned, completed your video, and then you left shortly after the medical examiner's office

left; is that correct?

A.     That's correct.

Q.     Did you ever go back to the crime scene after that?

A.     No, I did not.

Q.     Okay.    Detective, you mentioned Officer Grice; is that correct?

A.     Crime Scene Technician Grice.

Q.     I'm sorry.    Crime Scene Technician Grice.

And the evidence and items that she was photographing, documenting, those are the items that had been seen by the responding officers and had been in plain view; is that correct?

A.     That is correct.

*(RR. VI-83-87).*

The State did not obtain the evidentiary search warrant for Appellant's apartment until 10:13 a.m. on May 2, 2013. *(RR. XLII-SPTX 1).*

Appellant has preserved this error for appellate review by filing a pretrial Motion to Suppress and obtaining a ruling on that Motion from the trial court.

*(CR. II-409). <u>See</u>, Tex. R. App. Proc. 33.1 (a); Tex. R. Evi. 103 (a) (1).* Though not necessary for preservation, Appellant objected, in front of the jury, to the admission of all items of evidence seized prior to the Bedford Police Department's obtainment of a search warrant. *(RR. XXXII-71).*

### B. <u>The Law Under the Federal and Texas Constitutions</u>

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . ." *U.S. Const. Amend. IV.* Searches conducted without a warrant are per se unreasonable under *the Fourth Amendment,* subject only to a few specifically established and well delineated exceptions. <u>*Katz v United States*</u>*, 389 U.S. 347, 357 (1967)* (footnotes and citations omitted). "The five basic exceptions are: (1) consent, (2) incident to a lawful arrest, (3) with probable cause to search but with exigent circumstances, (4) in hot pursuit, and (5) stop and frisk." <u>*Kolb v State*</u>*, 532 S.W. 2d 87, 89 n. 1 (Tex. Crim. App. 1976).* Once a defendant shows that a search or seizure or seizure occurred without a warrant, the burden shifts to the State to prove the reasonableness of the search or seizure. <u>*Russell v State*</u>*, 717 S.W. 2d 7, 9 (Tex. Crim. App. 1986).* A warrantless search of a residence is presumptively unreasonable. <u>*Gutierrez v State*</u>*, 221 S.W. 3d 680,*

33

*685 (Tex. Crim. App. 2007) (citing <u>Payton v New York</u>, 445 U.S. 573, 586 (1980)).* To hold a warrantless search valid, a reviewing court must make three findings: (1) that the search was supported by probable cause, the threshold requirement of any valid search; (2) that the failure to obtain a search warrant was excusable because the search was incident to a lawful arrest or was justified by some other exigent circumstance furnishing an exception to the warrant requirement; and (3) that the scope of the search was consistent with its purpose. *<u>Maldonado v State</u>, 528 S.W. 2d 234, 239 (Tex. Crim. App. 1975) overruled in part on other grounds, <u>State v Guzman</u>, 959 S.W. 2d 632 (Tex. Crim. App. 1998); <u>Sullivan v State</u>, 564 S.W. 2d 698 (Tex. Crim. App. 1977).* As explained herein, the record in this case does not support a finding of the second or third criteria.

Here, the search of Appellant's apartment was conducted without a warrant. At the hearing on Appellant's Motion to Suppress, the State argued (inter alia) that (a) when the police first arrived at Appellant's apartment, "they had the right to go into that apartment to make a welfare check," (b) their "search" of the apartment was "a protective sweep of that apartment;" and (c) the evidence they seized "was in plain view." *(RR. VI-242-43).*

34

Appellant does not contest that the law enforcement officers' initial entry into his apartment was legal. However, the scope of their subsequent search of his apartment exceeded the legal justification for their entry into (and presence in) the apartment. First, the exigent circumstances only allowed the police to *enter* Appellant's apartment. Such exigency did not make the ensuing warrantless search of the apartment legal. Second, the warrantless search of Appellant's apartment was not "a protective sweep." A "protective sweep" is a quick and limited search of a premises, incident to an arrest and conducted to protect the safety of police officers or others. *Maryland v Buie*, 494 U.S. 325, 327 (1990). The search of Appellant's apartment was not conducted incident to any arrest. Assuming *arguendo* that this Court decides to expand the definition of a "protective sweep" to include the type of search at issue here, this search went beyond what the Supreme Court said *the Fourth Amendment* would permit. Under *Buie,* a protective sweep is permitted by *the Fourth Amendment* if the searching officer possesses a reasonable belief based on specific and articulable facts that, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the area swept harbored an individual posing a danger to the officer or others. *Id.* Thus, in *Reasor v State,*

*12 S.W. 3d 813 (Tex. Crim. App. 2000)* this Court concluded that the protective sweep in the defendant's home was illegal where the officer did not express his belief that any third persons were inside the defendant's home or articulate his belief that a third person inside the home was attempting to jeopardize either his or the public's safety. *Reasor at 817.*

Further, a "protective sweep" is nevertheless not a full search of the premises, *Buie at 335.* It "is narrowly confined to a cursory visual inspection of those places in which a person might be hiding" and "lasts no longer than is necessary to dispel the reasonable suspicion of danger." *Buie at 327, 335-36.* The search of Appellant's apartment did not meet any of these criteria. Officer Noel Scott, one of the first responders to the scene, testified that Damien had advised that Appellant had already left the scene. *(RR. VI-29-30).* If this was accurate information a "protective sweep" was rendered unnecessary and consequently, illegal.

Under certain circumstances, the police may seize evidence in plain view without a warrant. *Coolidge v New Hampshire, 403 U.S. 443, 465 (1971) overruled in part, Horton v California, 496 U.S. 128 (1990).* The Supreme Court explained in *Horton v California* just what those "circumstances" are:

It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. There are, moreover, two additional conditions that must be satisfied to justify the warrantless seizure. First, not only must the item be in plain view, its incriminating character must also be "immediately apparent." *Id.* at 403 U.S. 466; *see also Arizona v Hicks,* 480 U.S. at 326-327. . ..Second, not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself. . . .

*496 U.S. 128, 136-37 (1990).* Evidence that an officer purposefully seeks out is not in "plain view." <u>*White v State*</u>, *729 S.W. 2d 737, 742 (Tex. Crim. App. 1987), disavowed in part,* <u>*State v Dobbs*</u>, *323 S.W. 3d 184 (Tex. Crim. App. 2010)*[16] (citing <u>*Walter v United States*</u>, *447 U.S. 649 (1980)*).

In <u>*White*</u>, police responded to a disturbance call at an El Paso apartment complex and were advised by the manager of the complex that a fight was in

---

[16]In <u>*Dobbs*</u>, this Court held that, "so long as probable cause to believe that items found in plain view constitute contraband arises while police are still lawfully on the premises, and any further investigation into the nature of those items does not entail an additional and unjustified search of, or unduly prolonged police presence on, the premises, the seizure of those items is permissible under the Fourth Amendment." 323 S.W. 3d at 185. Thus, to the extent *White* remains good law, it is applicable to this case, and <u>*Dobbs*</u> is inapposite, because this case does not involve "an additional and unjustified search of," and an "unduly prolonged police presence on, the premises."

progress in one of the units. *729 S.W. 2d at 738.* While the officers were questioning the two men they observed exiting the apartment in question, the manager walked into the open apartment, then called out and asked the officers to examine "damage" apparently resulting from the fight between the two men. *Id.* Two officers entered the apartment and observed property strewn about the floor. *Id. at 738-39.* One officer observed a J.C. Penney credit card in the top of the stove. *Id. at 739.* The name on the card did not match either of the names given earlier by the two tenants. *Id.* After checking with the police department and receiving a negative report that the card was stolen, the officer returned the credit card to the stove where he had found it and then "looked around the apartment," noticing that there was a large amount of "female" jewelry strewn about one area of the floor and several stereos and other items of personal property also scattered about the apartment. *Id.* The officer took the serial number off the back of one stereo without moving the piece of equipment and also wrote down the name and address of an individual that was written on a backpack found on the floor. *Id.* He then called the police station to check on the items, but again received a negative response that the items were stolen. *Id.* Finally, the officer left the apartment, walked upstairs to the manager's

apartment, phoned the records and identification section of the police department, gave them the name found on the backpack to check for filed complaints, and was advised that the individual had indeed filed a burglary complaint. *Id.*

The Court of Criminal Appeals ruled that the officers lacked probable cause to search for or to seize the property from the defendant's apartment. *Id. at 740.* Even if the initial police entry was legal, the Court said, "the officer's subsequent conduct satisfies neither the inadvertent nor the probable cause prong of the modified Coolidge test." *Id. at 741.* The officers' actions in continuing to "look around" the apartment were "clearly exploratory in nature," and it was only "after further investigative steps were taken, albeit most thoroughly," that the officers had probable cause to seize the items as stolen goods. *Id.* Similarly, in the instant case, the officers' warrantless search of Appellant's apartment after the exigent circumstances that justified their initial entry no longer existed "has all the elements of a systematic search for incriminating evidence." *Id. at 742.*

*Tex. Crim. Proc. Code Ann. art. 38.23 (a) (Vernon Supp. 2004)* bars the admission of "evidence obtained by an officer or other person in violation of any

provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America," against the accused on the trial of any criminal case. Appellant has shown *supra* that all of the items seized from his apartment subsequent to the procurement of the search warrant were obtained in violation of *the Fourth Amendment to the United States Constitution.* Therefore, the trial court erred in admitting all of the items in evidence at Appellant's trial[17]. Further, because additional items of evidence were "come at by exploitation of that illegality," all of it should have been excluded as well. *Wong Sun v United States, 371 U.S. 471, 488 (1963).*

Just as the search of his apartment exceeded the scope of *the Fourth and Fourteenth Amendments to the United States Constitution*, Appellant also asserts that it exceed that permitted under *art. I, §9 of the Texas Constitution.* As stated in his second point of error this Court in *Mayberry, 830 S.W. 2d 176, 180 (Tex. Crim. App. 1992)* concluded that *the Texas Constitution* affords greater individual protections to its citizens in search and seizure cases than *the*

---

[17]Appellant notes that the trial court did grant his Motion to Suppress regarding those few items that the police seized from "inside the nightstand, the papers and the photograph, and as to the bandages collected from the comforter." *(CR. II-409).*

*Fourth Amendment.* However, this Court has utilized the test for a "protective sweep" articulated in <u>*Maryland v Buie*</u>. <u>*Reasor*</u> *12 S.W. 3d at 816-17.*

Appellant has shown that the trial court erred in admitting all of the illegally seized evidence and that the error was an abuse of discretion. Because the error is constitutional error that is subject to a harmless error analysis, this Court must reverse the Judgment unless the Court determines beyond a reasonable doubt that the error did not contribute to Appellant's conviction or punishment. *Tex. R. App. Proc. 44.2 (a).* Appellant contends that the admission of the items of evidence, particularly the instruments used in the offense, did contribute to his conviction and ultimate death sentence. Though Damien testified during the guilt innocence phase of Appellant's trial regarding what he had witnessed, the jury was allowed to view and touch the instrumentalities of the massacre. Surely one could reason that such knowledge of inadmissible and prejudicial items of destruction contributed to the jury's findings of guilt and subsequent death sentence. Because of this Appellant respectfully prays that this Court reverse the trial court's Judgment and remand his back to the trial court with instructions that he be afforded a new trial. <u>*See*</u>*, Tex. Crim. Proc. Code Ann. art. 44.29 (a) (Vernon Supp. 2012).*

41

## POINT OF ERROR FIVE

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE SEIZED BECAUSE APPELLANT WAS DENIED HIS RIGHT TO COUNSEL IN VIOLATION OF *THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. (CR. I-284-99; RR. VI-120-43, 188-228, XLII-SPTX3, SPTX4, SPTX5, & SPTX6).*

## POINT OF ERROR SIX

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE SEIZED BECAUSE APPELLANT WAS DENIED HIS RIGHT TO COUNSEL IN VIOLATION OF *ARTICLE I, SECTION 10 OF THE TEXAS CONSTITUTION AND ARTICLES 1.05, 15.17, AND 38.23 OF THE TEXAS CODE OF CRIMINAL PROCEDURE. (CR. I-284-99; RR. VI-120-43, 188-228, XLII-SPTX3, SPTX4, SPTX5, & SPTX6).*

## POINT OF ERROR SEVEN

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE SEIZED BY LAW ENFORCEMENT BECAUSE APPELLANT WAS DENIED HIS RIGHT TO COUNSEL IN VIOLATION OF *OKLAHOMA STATUTES 22-251 AND 22-252. (CR. I-284-99; RR. VI-120-43, 188-228, XLII-SPTX3, SPTX4, SPTX5, & SPTX6).*

42

## ARGUMENT AND AUTHORITIES

## A. The Facts

After Appellant was placed under arrest by the Oklahoma Troopers the following sequence of events occurred as summarized in Appellant's Motion to Suppress all evidence seized subsequent to his unlawful arrest, the unlawful search of his apartment, and his denial of counsel. The record shows:

> At the police station, photographs were made of the Defendant's injuries at approximately 3:40 a.m. on May 2, 2013. A discussion between the police and the Defendant, which concerned the procedure for taking the photographs was done, but very little conversation otherwise occurred. The Defendant did ask how his situation was, and the Detectives stated that they would talk at a later time.
>
> At approximately 4:25 a.m. on May 2, 2013, the Defendant was taken to a local hospital. After treatment, the Defendant was returned to the Garvin County, Oklahoma jail. While at the hospital, the Defendant remained in police custody.
>
> The Defendant was interviewed at the Garvin County jail for about 5 minutes on 8:16 a.m. on May 2, 2013 by Detective Shelley and Mack. During the first minute

of the interview, the Defendant unequivocally invoked his right to counsel. Rather than stop the interview, the detectives went on to read the Defendant Miranda warnings. The Defendant then asked about underwear, medicine, and the nature of his charges. The detectives told the Defendant that he was being charged with two counts of murder, and one count of criminal attempted murder. The interview was then terminated.

At approximately 10:00 a.m. on May 2, 2013, the Defendant was taken before Special Judge Trisha Misak of the 21st District Court of Oklahoma. At this time, the Defendant requested a hearing on his extradition and did not waive extradition to the State of Texas. At approximately 1:30 p.m. on May 2, 2013, the Defendant was arraigned on a Fugitive from Justice charge by Special District Judge Misak, which resulted from his refusal to waive extradition.

At approximately 12:07 p.m. on May 2, 2013, the search warrant (Vehicle Warrant #1) was issued under Oklahoma law and signed by Special Judge Misak for the search of the vehicle the Defendant was operating at the time of his arrest. This warrant was executed at approximately 2:40 p.m.

At no time was the Defendant

44

arraigned on the Texas charges by any judge in Oklahoma.

On May 2, 2013, before 5:00 p.m., the Defendant was assaulted by several inmates of the Garvin County Jail which necessitated the Defendant being transported back to the county hospital. While at the hospital the Defendant was continuously in police custody.

On May 3, 2013, at approximately 8:30 a.m. the detectives were back to the Garvin County Sheriff's Office to Obtain videos from the inmate interviews concerning the assault on the Defendant by inmates of the Garvin County Jail. The detectives were informed that the Defendant wanted to waive his extradition rights and also wanted to speak with the detectives.

*(CR. I-292-94).*

The brutal and vicious assault perpetrated against Appellant by his fellow inmates was not coincidence. Detective Mack of the Bedford Police Department testified on cross-examination during the hearing on Appellant's Motion to Suppress that Appellant's presence in the cell with those particular inmates was contrived by the Sheriff of Garvin County. The record reflects:

45

Q.     And I want to - - I want to direct your attention to your report. I came across something interesting. It says you and Shelley and Ricks were there when he got arraigned and that the sheriff was there, and the sheriff - - I guess it's Sheriff Mullett - - informed you that he was going to put Ricks in general population; - -

A.     Yes, sir.

*     *     *

Q.     And there was a little additional information there, that he was going to put Ricks in general population obviously with the idea that if he were to say something about the offenses or would volunteer or get to talking about it, he was going to inform you about it?

A.     Yes, sir.

Q.     And that was coming from him independently; isn't that right?

A.     Yes.

Q.     You didn't ask him to do it?

A.     Didn't ask him to do anything.

Q.     And, certainly, you know, it's not a bad deal from your perspective if it did happen. If Ricks did go into the cell

46

and he said something you could use, that's not something you would necessarily refuse, right?

A.    Correct.

Q.    And certainly you're in no position to tell the sheriff up there in Oklahoma how to run his show; - -

A.    Yes, sir.

Q.    - - is that right?

A.    That's correct.

Q.    All right.  So not only does he get arraigned on his fugitive charge, the sheriff himself says, "Listen, I'm going to send this guy into general population, and we'll see what happens," essentially, right?

A.    Yes, sir.

*    *    *

Q.    How long was it from the time y'all left the sheriff in the courtroom with Mr. Ricks was it before you got the phone call that there was a fight out there in the jail?

A.    I don't - - I don't know what time we received a - - the telephone call - -

47

Q.      Uh-huh.

A.      - - informing us of the assault. I know that the arraignment was at 1:30 p.m. and that we had the search warrant for the vehicle executed at 2:40 p.m., and it was during that time that the search warrant was being executed that we received a telephone call.  So - -

                *       *       *

Q.      How soon after the fight did you see him?

A.      Not knowing when the actual fight occurred, I saw him being led out from the jail to a transport unit to be taken to the hospital.

Q.      How did he look to you physically?

A.      Beat up.

                *       *       *

Q.      So the injuries you were able to see were what?

A.      The eye, blood coming from his mouth.

                *       *       *

48

Q.      All right.  He's on his way to the hospital at that point, I'm assuming, and when he gets back from the hospital, do y'all get a call that he wants to talk to y'all?

A.      I believe it was the next day.

\*      \*      \*

Q.      Okay.

A.      We got the call that he wanted to speak with us and that he was willing to waive his rights.

*(RR. VI-216-20).*

## B. Federal Constitutional Law

Once the adversarial judicial process has been initiated, *the Sixth Amendment to the United States Constitution* guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings. *United States v Wade, 388 U.S. 218, 227-228 (1967); Powell v Alabama, 287 U.S. 45, 57 (1932).*  Interrogation by the State is one such stage. *Massiah v United States, 377 U.S. 201, 204-05(1964). See also, United States v Henry, 447 U.S. 264 274 (1980).*  This right to counsel may be waived by a defendant, so long as relinquishment is voluntary, knowing, and intelligent. *Montejo v*

*Louisiana,* 556 U.S. 778 (2009) (citations omitted). Police may not threaten, trick, or cajole an accused into waiving his constitutional rights. *Nash v State,* 477 S.W. 2d 557, 563 (Tex. Crim. App.) cert. denied, 409 U.S. 887 (1972).

Separate and distinct from the Sixth Amendment right to counsel is *the Fifth Amendment* right to have counsel present at any custodial interrogation. An individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation. *Miranda v Arizona,* 384 U.S. 436, 471 (1966). *The Fifth Amendment* right to counsel during police interrogation is triggered by the Miranda warnings that police are lawfully required to give an individual before beginning any custodial questioning. *Pecina v State,* 361 S.W. 3d 68 (Tex. Crim. App. 2012). To invoke this right, the defendant must unambiguously request counsel. *Davis v United States,* 512 U.S. 452, 459 (1994). Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Id.* (quoting *McNeil v Wisconsin,* 501 U.S. 171, 178 (1991)).

Under *Miranda,* if the individual states that he wants an attorney, then the interrogation must cease until an attorney is present. *384 U.S. at 474.* At that

time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. *Id. at 474.* If the individual can not obtain an attorney, and he indicates that he wants one before speaking to police, then they must respect his decision to remain silent. *Id. at 474.* If the questioning continues without the presence of an attorney and a statement is taken, then the State will bear "a heavy burden…to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id. at 475.* When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right can not be established by showing only that he responded to further police initiated custodial interrogation, even if he has been advised of his rights. *Edwards v Arizona, 451 U.S. 477, 484 (1981).* A waiver of the right to counsel that follows an "unequivocal election of the right" is also invalid. *Montejo v Louisiana at 797 (quoting Texas v Cobb, 532 U.S. 162, 176 (2001) (Kennedy, J., concurring)).* And, if both *the Fifth and Sixth Amendment* right to counsel had accrued, then a valid waiver of counsel rights "should not be inferred from the mere response by the accused to overt or more subtle forms of interrogation - - or other efforts to elicit incriminating

information." *Edwards v Arizona* at 484 n. 8. An accused who has expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police. *Id. at 484-85.*

Once an accused, subjected to custodial interrogation, has requested counsel or indicated a desire to consult counsel, the law enforcement authorities may not threaten, trick, or cajole an accused into a waiver of his constitutional rights in order to be able to continue the interrogation. *Nash v State* at 563.

### C. Texas Constitutional and Statutory Law

"In all criminal prosecutions the accused...shall not be compelled to give evidence against himself and shall have the right of being heard by himself or counsel, or both..." *Tex. Const. art. I, §10.* In *Hernandez v State, 726 S.W. 2d 53, 56-57 (Tex. Crim. App. 1986)* this Court held that our constitutional and statutory provisions do not create a standard in ineffective assistance cases that is more protective of a defendant's rights than the standard put forward by the Supreme Court in *Strickland v Washington, 466 U.S. 668 (1984).* A Court of Appeals has interpreted this to mean "that the Texas Constitution's guarantee

of a right to counsel does not exceed the parallel guarantee under the Sixth and Fourteenth Amendments to the United States Constitution." *Duhart v State*, 890 S.W. 2d 187, 188 (Tex. App. - - Corpus Christi 1994, no pet.).

*Art. 15.17 (a) Tex. Crim. Proc. Code Ann. (Vernon 2009)* requires that the person making the arrest or the person having custody of the person arrested to, "without unnecessary delay, but not later than 48 hours after the person is arrested, take the person arrested or have him taken before some magistrate of the county where the accused was arrested or, to provide more expeditiously to the person arrested the warnings described by this article, before a magistrate in any other county of this state."  The magistrate's duties (that are relevant to the issues in the case at bar) are as follows:

> The magistrate shall inform in clear language the person arrested, either in person or through the electronic broadcast system, of the accusation against him and of any affidavit filed therewith, of his right to retain counsel, of his right to remain silent, of his right to have an attorney present during any interview with peace officers or attorneys representing the state, of his right to terminate the interview at any time, and of his right to have an examining trial.  The magistrate shall also inform the person arrested of the person's right to request the appointment of counsel if the person cannot afford counsel. The magistrate shall inform the person arrested of the procedures for requesting

appointment of counsel. . . .The magistrate shall ensure that reasonable assistance in completing the necessary forms for requesting appointment of counsel is provided to the person at the same time.  If the person arrested is indigent and requests appointment of counsel and if the magistrate is authorized under Article 26.04 to appoint counsel for indigent defendants in the county, the magistrate shall appoint counsel in accordance with Article 1.051.  If the magistrate is not authorized to appoint counsel, the magistrate shall without unnecessary delay, but not later than 24 hours after the person arrested requests appointment of counsel, transmit, or cause to be transmitted to the court or to the courts' designee authorized under Article 26.04 to appoint counsel in the county, the forms requesting the appointment of counsel. The magistrate shall also inform the person arrested that he is not required to make a statement and that any statement made by him may be used against him. The magistrate shall allow the person arrested reasonable time and opportunity to consult counsel and shall, after determining whether the person is currently on bail for a separate criminal offense, admit the person arrested to bail if allowed by law.

*Tex. Crim. Proc. Code Ann. art. 15.17 (a).*  These duties are mandatory. *Tex. Op. Att'y Gen. GA-0993 (2013).*  Because *the Texas Code of Criminal Procedure* "is intended to embrace rules applicable to the prevention and prosecution of offenses against the laws of this State," *art. 1.03 Tex. Crim. Proc. Code Ann. (Vernon 1965),* Appellant contends that the provisions of *art. 15.17* should have

54

been followed by the arresting officers and magistrate in Oklahoma, since Appellant was arrested, and ultimately prosecuted, for offenses against the laws of this State.

In the alternative, if the arresting officers and Judge Misak had fulfilled their duties under *art. 15.17,* then the trial court should have granted Appellant's Motion to Suppress because Appellant's *Sixth Amendment* right to counsel attached at the hearing. *See, Pecina v State.* ("The Sixth Amendment right to counsel is triggered by judicial arraignment or Article 15.17 magistration.")

"No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." *Tex. Crim. Proc. Code Ann. art. 38.23 (a) (Vernon 1987).* The trial court erred in denying Appellant's Motion to Suppress and admitting in evidence all of the items seized after his unlawful arrest and his unlawful denial of counsel. Further, any other evidence derived or obtained from the evidence collected in violation of Appellant's constitutional rights should have been excluded as "fruit of the poisonous tree." *Wong Sun v United States at 488)* (quoting Maguire, *Evidence of Guilt* 221 (1959)). It was

therefore error for the trial court to deny Appellant's Motion to Suppress.

A violation of *art. 15.17* "does not rise to the status of a denial of due process." *Perry v Jones, 506 F. 2d 778, 781 (5th Cir. 1975) (citations omitted).* Therefore, for purposes of a harm analysis, Appellant will treat the harm caused by the erroneous denial of his Motion to Suppress as non constitutional error under *Tex. R. App. Proc. 44.2 (b).* Thus, the trial court's erroneous denial of Appellant's Motion to Suppress all evidence seized as a result of his unlawful denial of counsel must be disregarded unless a substantial right of Appellant was affected. "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v State, 953 S.W. 2d 266, 271 (Tex. Crim. App. 1997).*

### D. Oklahoma Statutes

The law requiring the appointment of counsel appears to be the same in the State of Oklahoma. In *Wyatt v Wolf, 324 P. 2d 548 (Okla. Crim. App. 1958)* the Oklahoma Court of Criminal Appeals stated:

> "We hold that the express provisions of the Constitution and the statutes and the clear implications thereof, especially *22 O.S. 1951 §251*, is that the accused must be advised of his right to aid of counsel when brought before the magistrate. If he desires aid of counsel and

is unable because of poverty to obtain counsel, it necessarily follows that the magistrate should appoint counsel for him.  Certainly such practice is within the spirit of the law.  Otherwise, the advice in such cases, as to the right, is a vain and meaningless gesture without affecting the provisions of the right.  In other words, how can we assert the right in one instance and deny it in another?  We are of the considered opinion that the clear intent of the foregoing provisions and interpretations thereof is that the accused is entitled to representation of counsel if he so desires; either of his own choice, if able to provide the same, and if not by appointment of the magistrate. Equal protection of the law, where indigent defendants are involved, requires such procedure be invoked in order that the accused's substantial rights may be protected.  As of this feature of the within petition for writ of mandamus, the examining magistrate is ordered to appoint counsel for the accused."

*Wyatt v Wolf* at 551.

*See also*, *Brown v State*, 266 P. 476, 39 Okla. Crim. 406 (Okla. Crim. App. 1928); *Tipton v State*, 235 P. 259, 30 Okla. Crim. 56 (Okla. Crim. App. 1925); *Polk v State*, 224 P. 194, 26 Okla. Crim. 283 (Okla. Crim. App. 1924).

### E. The Application of the Facts to the Law

In the case at bar, Appellant was arrested by the Oklahoma State Troopers. He was taken before the Oklahoma magistrate, Judge Trisha Misak, to be arraigned. Judge Misak arranged him on his pending fugitive case.  For whatever

reason she refused to appoint him a lawyer. In her court minutes she wrote that she would have Appellant brought back to court on May 24, 2013, twenty-two days later – clearly longer than the Oklahoma statute permits – to determine whether or not she would appoint counsel. *(RR. XLII-SPTX4).* Not only was this a violation of the Oklahoma statute; it was clearly a violation of both the Federal and Texas constitutions as well as Texas state statutes. Subsequently Sheriff Mullett, instead of isolating Appellant in a single cell, threw him into a cell with "wolves" who eventually beat him so severely that he required medical treatment at the local hospital. Only after his aggravated assault did Appellant subsequently provide a videotaped statement composed of various incriminating statements but he also waived the extradition proceeding and agreed to go back to Texas. Appellant contends that his decision to waive extradition stemmed from Judge Misak's refusal to follow the Federal and State Constitutionals as well as the Oklahoma statutes. All evidence seized by law enforcement after Appellant's denial of counsel should have been suppressed.

Appellant respectfully requests that this Court sustain his fifth, sixth, and seventh points of error, reverse the trial court's Judgment, and remand his case back to the trial court with instructions that he be granted a new trial.

## POINT OF ERROR EIGHT

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ALLOWING THE STATE TO INTRODUCE SX225 AN AUTOPSY PHOTOGRAPH OF JAMES GONZALEZ'S BRAIN BECAUSE THE PREJUDICIAL EFFECT GREATLY OUTWEIGHED ANY PROBATIVE VALUE. *(RR. XXXII-113-16; XLIV-SX#225).*

## POINT OF ERROR NINE

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ALLOWING THE STATE TO INTRODUCE SX226 AN AUTOPSY PHOTOGRAPH OF JAMES GONZALEZ'S BRAIN BECAUSE THE PREJUDICIAL EFFECT GREATLY OUTWEIGHED ANY PROBATIVE VALUE. *(RR. XXXII-113-16; XLIV-SX#226).*

## ARGUMENT AND AUTHORITIES

Appellant made the following objection to State's Exhibits #225 and #226 outside the presence of the jury. The record reflects:

> [PROSECUTOR] Okay, Your Honor. These photographs are the photographs of [James'] break in the skull, and there will be testimony from Dr. Greenberg that one of the stab wounds entered his skull and entered the brain. Okay?
>
> And these photographs are to clarify observations and conclusions about the

injuries, because they will show how they were received. They're more probative than they are prejudicial. Just because they're internal organs does not mean they're inadmissible.

[DEFENSE COUNSEL] Judge, I understand the State's argument, but the difficulty we have is that the evidence presented so far, and the crime scene evidence presented so far, is very descriptive and very graphic, which we have not objected to.

The description - - the doctor is a learned professional in forensic science. She can explain through detail, through testimony, without the jury being subjected to this highly prejudicial photograph of someone's brain being exposed, as well as someone's interior - - the interior part of their skull being exposed. All of that can be described without the exhibit.

And it is our position that 225 and 226 are highly prejudicial and would result in the jury making a decision on our client's guilt or innocence based on a horrific exhibit that has already been submitted to the jury and not objected to by Defense.

[DEFENSE COUNSEL] And her testimony - - the relation of these two exhibits is not going to be disputed in any form or fashion.

60

THE COURT: I'm going to overrule your objection, and I'm admitting 188 through 226.

*(RR. XXXII-114-16).*

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." *Tex. R. Evid. 403.* When a photograph is offered in evidence, "Rule 403 requires that the photograph have some probative value and that its probative value not be substantially outweighed by its inflammatory nature." *Long v State, 823 S.W. 2d 259, 272 (Tex. Crim. App. 1991), cert. denied, 505 U.S. 1224 (1992).* Once a defendant objects to photographic evidence on the basis of *Rule 403,* the trial court must weigh its probative value against its potential for unfair prejudice. *Narvaiz v State, 840 S.W. 2d 415, 429 (Tex. Crim. App. 1992) cert. denied, 507 U.S. 975 (1993).*

When undertaking a *Rule 403* analysis, a trial court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to

61

confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v State, 210 S.W. 3d 637, 641-42 (Tex. Crim. App. 2006).* In reviewing a trial court's decision to admit or exclude evidence for abuse of discretion, an appellate court must (1) decide whether the trial judge did in fact conduct the required balancing test and "did not simply rule arbitrarily or capriciously," and (2) "measure the trial court's ruling against the relevant criteria by which a Rule 403 decision is to be made." *Montgomery v State, 810 S.W. 2d 372, 392 (Tex. Crim. App. 1990).* Under this standard, "judicial rulings will be affirmed if the trial court follows the appropriate analysis and balancing factors." *Montgomery at 380.*

In the case at bar, the trial court did not conduct the requisite balancing test on the record. However, "a judge is presumed to engage in the required balancing test once Rule 403 is invoked," and a trial court is not required to state on the record that it had conducted the *Rule 403* balancing test," *Williams v State, 958. S.W. 2d 186, 195-96 (Tex. Crim. App. 1997).* Therefore, Appellant

will analyze the trial court's ruling against the relevant criteria by which a *Rule 403* decision is to be made.  An abuse of discretion arises only when the probative value of the photograph is small and its inflammatory potential is great. *Ramirez v State, 815 S.W. 2d 636 (Tex. Crim. App. 1991)* (citing *Burdine v State, 719 S.W. 2d 309, 316 (Tex. Crim. App. 1986)*).

Evidence is unfairly prejudicial when it has "an undue tendency to suggest that a decision be made on an improper basis." *Montgomery at 389.*  A photograph should be excluded if it is so horrifying or appalling that a juror of normal sensitivity would necessarily encounter difficulty rationally deciding the critical issues of the case after viewing it. *Fuller v State, 829 S.W. 2d 191, 206 (Tex. Crim. App. 1992) cert. denied, 508 U.S. 941 (1993).*  As a general rule, "post-autopsy photographs are inadmissible because they depict primarily what was done by the doctor who performed the surgery, rather than what was done by the appellant." *O'Neill v State, 681 S.W. 2d 663, 671 (Tex. App. - - Houston [1st Dist.] 1984, pet. ref'd).*  Thus, in *Terry v State, 491 S.W. 2d 161, (Tex. Crim. App. 1973)* the trial court abused its discretion by not sustaining the appellant's objections to pictures that showed "massive mutilation of the subject matter caused by the surgery in performing the autopsy." *Terry at 164.*

This case is analogous to <u>Corbett v State,</u> *764 N.E. 2d 622 (Ind. 2002)*, a murder and robbery case in Indiana in which the trial court admitted multiple photographs taken immediately before, during, and after the autopsy performed on the decedent. Three of the exhibits depicted the victim's brain removed from his skull. *Id. at 628.* On appeal, the Supreme Court of Indiana held that the photographs were cumulative and that their prejudicial effect outweighed their probative value; thus, it was error to allow them to be admitted. *Id.*[18] Similarly, in <u>Ritchie v State,</u> *632 P. 2d 1244, 1246 (Okla. Crim. App. 1981)*, another murder case, photos that showed the brain and skullcap of the deceased child

---

[18]Ind. Rule Evid. 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." While this language is not identical to Tex. R. Evid. 403, the *Corbett* court followed the same standard of review for admission of photographic evidence that Texas courts do:
Because the admission and exclusion of evidence falls within the sound discretion of the trial court, this Court reviews the admission of photographic evidence only for abuse of discretion. *Byers v State*, 709 N.E. 2d 1024, 1028 (Ind. 1999); *Amburgey v State*, 696 N.E. 2d 44, 45 (Ind. 1998). Relevant evidence, including photographs, may be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice. Ind. Evidence Rule 403; *Byers,* 709 N.E. 2d at 1028. "Even gory and revolting photographs may be admissible as long as they are relevant to some material issue or show scenes that a witness could describe orally." *Amburgey,* 696 N.E. 2nd at 45; *see also Byers,* 709 N.E. 2d at 1028. Photographs, even those gruesome in nature, are admissible if they act as interpretative aids for the jury and have strong probative value. *Spencer v State,* 703 N.E. 2d 1053, 1057 (Ind. 1999); *Robinson v State,* 693 N.E. 2d 548, 553 (Ind. 1998).

were held inadmissible by the Court of Criminal Appeals in Oklahoma. *See also,*

*Reese v State,* *33 S.W. 3d 238 (Tex. Crim. App. 2000) (The appellant's death*

sentence was reversed based upon the prejudice of a single photograph).

Considering all of the relevant criteria, the record in this case reveals a risk

that the probative value of the evidence is substantially outweighed by unfair

prejudice, confusion of the issues, and/or misleading the jury.  Both of these

pictures of James' brain were gruesome and unnecessary to the jury's

understanding of his injuries.  The medical examiner had testified about them;

the pictures were redundant and grossly prejudicial.  This Court should therefore

conclude that the trial court acted irrationally in failing to exclude both exhibits,

and thus abused its discretion. *Montgomery,* *810 S.W. 2d at 392-93.*

Appellant has shown *supra* that it was error for the trial court to overrule

Appellant's objections and admit the two photographs of James Gonzalez's brain

into evidence.  Because the error was non-constitutional, however, a reversal of

the Judgment against Appellant is justified if a substantial right of Appellant's

was affected. *See,* *Tex. R. App. Proc. 44.2 (b).*  "A substantial right is affected

when the error had a substantial and injurious effect or influence in determining

the jury's verdict." *King v State* *at 271;* (citing *Kotteakos v United States,* *328*

65

*U.S. 750, 776 (1946))*

A court may consider many factors in determining whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, including: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black and white, whether they are close-up, and whether the body depicted is clothed or naked. *Wyatt v State, 23 S.W. 3d 18, 29 (Tex. Crim. App. 2000)* (citing *Long v State at 272*). "A court, however, should not be limited by this list. The availability of other means of proof and the circumstances unique to each individual case should also be considered." *Id.* As stated above, the pictures were in color. They were gruesome. Their admission was unnecessary to show the child's injuries which had been detailed by the medical examiner. Appellant asserts that the State offered them solely to inflame the jury against him and render it more likely that he would ultimately be assessed a death sentence. Clearly the admission of two such prejudicial photographs of the brain of an eight-year-old child substantially influenced the jury's verdict of guilt and sentence of death. As a result, Appellant requests that this Court sustain points of error eight and nine, reverse the trial court's Judgment, and remand his case to the trial court with instructions that

he receive a new trial.

## POINT OF ERROR TEN

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO DECLARE THE "10-12" RULE UNCONSTITUTIONAL ON THE GROUNDS THAT IT CREATES AN IMPERMISSIBLE RISK OF ARBITRARY IMPOSITION OF THE DEATH PENALTY. *(CR. I-187-217; RR. V-79-80).*

Appellant argued in his motion that the "10-12 Rule" unconstitutionally prevents a single juror from giving effect to his belief that a mitigating factor militates against the imposition of the death penalty. *Article 37.071, § 2 (d) (2)* requires the trial court to charge the jury that it may not answer any issue submitted under *subsection (b)* "yes" unless it agrees unanimously, and it may not answer any issue "no" unless ten or more jurors agree. In the event the jury is unable to answer either the future danger or parties question, *art. 37.071, § 2 (g)*, the court shall sentence the defendant to confinement for life imprisonment without the possibility of parole.

In capital cases, the Supreme Court is committed to ensuring that there is sufficient process to "guarantee, as much as is humanly possible, that the sentence was not imposed out of whim … or mistake. *Eddings v Oklahoma, 455 U.S. 104, 118 (1982)* (O'Connor, J., concurring) (overruled on other grounds).

The Texas death penalty statute affirmatively creates confusion in the minds of the jurors. Jurors are first told that the jury as a whole "shall" answer "yes" or "no" to each issue presented; they are subsequently told that ten or more jurors must be in agreement to give one set of answers and that they must be unanimous in order to give another. This necessarily raises the question of what happens in the event that the jury, despite being instructed that it must answer each question, is unable to get the minimum number of votes required to give either answer. The statute clearly provides that in the event of a non-answer, the defendant is to receive that which is substantively identical to that which he would have received had there been a verdict in favor of life, and thus the law itself exhibits no confusion with regard to the situation presented. However, not only does the statute fail to do all that is humanly possible to endure that decisions regarding life and death are not made as a result of that manufactured confusion – it actively prohibits any clarification of the confusion by preventing jurors from being informed at any point of the effect of a non-answer.

Death penalty cases are required to be subjected to greater constitutional protections than those applied to non-death penalty cases ("death is different"). *Eddings v Oklahoma*, 455 U.S. 104 (1982); *Lockett v Ohio*, 438 U.S. 586

69

*(1978); Simmons v South Carolina, 512 U.S. 154 (1994). See also, Miller v Alabama, 567 U.S. ____, 132 S. Ct. 2455 (2012); Graham v Florida, 560 U.S. 48 (2010); Kennedy v Louisiana, 554 U.S. 407 (2008); Baze v Rees, 553 U.S. 35 (2008). See also Jimenez v State, 32 S.W. 2d 233 (Tex. Crim. App. 2000); Ex parte Tucker, 973 S.W. 2d 950 (Tex. Crim. App. 1998); Morris v State, 940 S.W. 2d 610 (Tex. Crim. App. 1996); Anderson v State, 932 S.W. 3d 502 (Tex. Crim. App. 1996).*

The result of misinforming jurors and forcing them to deliberate without knowledge of what happens in the event of a non-answer is that they are presented with a false dilemma.  Jurors are given general instructions that they must answer either "yes" or "no" to the issues before them, and specific instructions that define the minimum number of votes required to give each of these a specific answer.  Because they are told that a death sentence follows from one set of answers, and a life sentence follows from another, a reasonable juror might conclude that the only way to get either of these punishments is to answer the questions posed to them. *See, California v Brown, 479 U.S. 538, 541 (1987)* (quoting *Francis v Franklin, 471 U.S. 316 (1985)* (holding that the constitutional sufficiency of capital sentencing instructions is determined by

"what a reasonable juror could have understood the charge as meaning)." This leaves jurors free to speculate as to what would occur should they be unable to provide an answer to the issues. While it is possible that jurors might correctly guess that the failure to agree will result in a life sentence, it is perhaps more likely that they will conclude that a non-answer will lead to a lesser sentence, a costly retrial or resentencing proceeding, or absolute freedom for the defendant. Given that each of the jurors has already found the defendant guilty of a capital offense, none of those options would look desirable to a juror who honestly believes that a life sentence is warranted. Jurors are left to deliberate with the false belief that if they are unable to gain unanimity for a death sentence or ten or more votes for a life sentence, an altogether third option will result. In *Simmons v South Carolina* at 171, the Supreme Court prohibited just this sort of unfairness, holding that "[t]he State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole."

In *Scales v State*, 380 S.W. 3d 780 (Tex. Crim. App. 2012), a non-death penalty case, the Court dealt with a request from the jury foreman that a juror,

who allegedly would not participate in the deliberations, be removed.  The trial

court, after hearing from the foreman, indicated intent to remove the juror and

seat an alternate. The defendant requested that the trial court question the juror

but the court refused.  Instead, the court questioned the foreman again and,

after finding him credible, removed the juror of which complaint was made and

replaced her with an alternate.

The Court of Appeals reversed and remanded. *Scales v State*, No. 01-08-

*0932-CR (Tex. App. - - Houston [1st Dist.] December 20, 2010) (not designated*

*for publication), slip op. at 7.*  After the State filed a petition for discretionary

review, the Court of Appeals withdrew its original opinion and, pursuant to *Rule*

*50, Tex. R. App. Proc.,* issued another opinion.  The second opinion reached the

same result as the first. *Scales v State*, No. 01-08-0932-CR *(Tex. App. - -*

*Houston [1st Dist.] April 14, 2011) (not designated for publication).*  The Court

granted the State's petition for discretionary review from the second opinion.

The trial court in *Scales* had found the juror to be disabled, necessitating

a study of the requirements of *art. 36.29 Tex. Crim. Proc. Code Ann. (Vernon*

*2009)* relating to a disabled juror.  According to the foreman's testimony before

the trial court, the juror in question had taken into account the facts and law and

had made up her mind, refusing to talk about "her side" of the case or take into account others' views.  The Court characterized the evidence relating to the jury's deliberations as:

> The foreman twice testified as to what "we" did in a context that indicates that "we" is the eleven jurors other than Collins.  The foreman's statement that both reasons named by the trial court applied, combined with his statement that "[s]he will not talk about the facts of the case as we perceived during testimony," at least tends to show that Collins's perceptions about the evidence were not shared by the other eleven jurors, that she did not agree with the other eleven that the contents of the read backs were "fact," that she had made a decision about what the evidence proved, and that her refusal to deliberate was actually a refusal to change her mind.  That possibility was not explored before the trial court removed Collins from the jury. We find that the trial court had insufficient information from which to determine that Collins was not able to perform her duties as a juror. The trial court erred when it replaced Collins with an alternate without ascertaining Collins's reasons for "not deliberating."

> *Scales*, slip op. at 9-10.
> [footnote omitted].

The Court recognized that the trial court's action in replacing the holdout juror affected the defendant's substantial right to a unanimous jury and thus, the error had a substantial and injurious  effect or influence in determining the jury's

73

verdict, and was, therefore, reversible error. *Scales, slip op. at 10.* This recognition, that error committed during jury deliberations, including pressures put on those members of the jury who are holding out against an even overwhelming majority, implicates substantial and constitutionally based rights, and can be error, can not be ignored in the instant case.

The Court wrote, "We find that the trial court had insufficient information from which to determine that Collins was not able to perform her duties as a juror." In doing so, the Court set a standard for trial courts to follow when dealing with potential interference with individual jurors by other members of the jury. The standard, informed and required by the Constitution, applies in non-death penalty cases, and is required to assure the defendant's constitutional rights were protected.

That the protections accorded in the defendant in *Scales* must be accorded to those facing the death penalty, as a matter of constitutional imperative, can not be seriously argued. The procedure found to be required by the substantial rights implicated in *Scales* must be considered by this Court in addressing this claim.

The Court's opinion in *Scales, supra,* demonstrates that death penalty

74

cases in Texas are treated in the exact opposite manner, with the "10-12 Rule" operating to deny death penalty defendants the review mandated by *Scales* in non-death penalty cases. As such, the "10-12 Rule" violates the *Constitution of the United States*, as well as the Supreme Court's "death is different" directives. Consequently, the "10-12 Rule" can not stand.

Death penalty cases are required to be subjected to greater constitutional protections than those applied to non-death penalty cases ("death is different)." *Eddings, supra; Lockett, supra; Simmons, supra.* It is clear now that, as it pertains to jury deliberations and instructions, Texas defendants charged with capital murder are afforded lesser protections than are required by the Constitution of the United States and applied to non-death penalty defendants.

*ARTICLE 37.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE IS UNCONSTITUTIONAL BECAUSE IT FAILS TO PLACE THE BURDEN OF PROOF ON THE STATE REGARDING AGGRAVATING EVIDENCE.* (CR. I-142-46; RR. V-68).

## ARGUMENT AND AUTHORITIES

The trial court overruled Appellant's Motion to Preclude the Death Penalty as a Sentencing Option and to declare *art. 37.071 Tex. Crim. Proc. Code Ann. (Vernon 2009)* unconstitutional for shifting the burden of proof on mitigation to Appellant. *(RR. V-68).* The trial court also overruled Appellant's Motion to Declare *Article 37.071* Unconstitutional because it places the mitigation burden of proof on the defendant. *Tex. Crim. Proc. Code art. 37.071 §2 (e) and (f)* require a jury which has convicted a defendant of capital murder, in a case in which the State is seeking the death penalty, to be charged as follows:

> (e) (1) The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection 9b) of this article, it shall answer the following issue: Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, thee is a sufficient mitigating

76

circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed. . ..

> (f) The court shall charge the jury that in answering the issue submitted under Subsection (e) of this article, the jury:

> (1) shall answer the issue "yes" or "no;"

> (2) may not answer the issue "no" unless it agrees unanimously and may not answer the issue "yes" unless 10 or more jurors agree;

> (3) need not agree on what particular evidence supports an affirmative finding on the issue; and

> (4) shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

This statute is unconstitutional because it impermissibly shifts the burden of proof on mitigation to the defendant. The statute requires the jury to consider, along with mitigating evidence, the "moral culpability of the defendant," having just found the defendant guilty of the offense, beyond a reasonable doubt. The statute then demands that the defense produce "sufficient" mitigation (while considering this same "moral culpability)" to warrant a sentence of life imprisonment. The mitigating evidence must be "sufficient" to reduce the defendant's moral culpability or blameworthiness as already established in the jurors' minds. In death penalty deliberations, "moral culpability" is not evidence;

77

it is a finding that the jury has already made. The statute places an unfair, undue, and unconstitutional emphasis on that finding. The defendant, if he is to save his own life, must offer evidence that is somehow greater than the finding of moral culpability beyond a reasonable doubt.

Aside from shifting the burden of proof to the defendant, the statute provides no other guidance to the jury that is called upon to make this life and death decision. As a result, the death penalty is imposed in a wanton haphazard manner in violation of the defendant's rights to due process and protection from cruel and unusual punishment.

This impermissible shift of the burden to the defense is made more unconscionable by the language of *Tex. Crim. Proc. Code art. 37.071 (2) (f)* which provides that the jury shall not answer the mitigation issue "yes" (resulting in a life sentence) unless ten or more jurors agree. The defense, according to the instructions to the jury, must then offer "sufficient" mitigating evidence to not only overcome his "moral culpability" as already established in the eyes of the jury, but ten of those jurors must be convinced of the sufficiency of that evidence.

Under the "due course of the law" provision of *the Texas Constitution,*

78

*Article I §10,* the citizens of this state are guaranteed that any punishment for an offense will be in accordance with the law. *McFarlane v State, 254 S.W. 2d 136 (Tex. Crim. App. 1953).* When the burden of proof is shifted to the defendant, the State's burden has essentially been reduced. *See e.g., Cobarrubio v State, 675 S.W. 2d 749 (Tex. Crim. App. 1983) overruled in part, Lawrence v State, 700 S.W. 2d 208 (Tex. Crim. App. 1985),* and *Elliott v State, 858 S.W. 2d 478, 487-88 (Tex. Crim. App. 1993).* This punishment, based on a reduced burden, violates Texas law and Federal constitutional due process guarantees.

Moreover, the effect of the statutory scheme is to require the defendant not merely to assume a burden of proving mitigation, but to demonstrate mitigation sufficient to outweigh the jury's pre-existing affirmative finding, beyond reasonable doubt, of the aggravating factor of future dangerousness. Appellant is aware of the existence of adverse authority in this matter. *See, e.g., Threadgill v State, 146 S.W. 3d 654, 671 (Tex. Crim. App. 2004); Kansas v Marsh, 548 U.S. 163 (2006).* (ruling that there is no violation where the defendant is required to prove mitigating circumstances sufficiently substantial to call for leniency), but nonetheless contend that these issues merit the Court's consideration.

Pursuant to *Tex. R. App. P. 44.2 (a),* if there is constitutional error, the appellate court must reverse unless it determines beyond a reasonable doubt that the error did not contribute to the conviction and violates *the Due Process Clause of the United State Constitution. U.S. Const. amend. XIV.*

## POINT OF ERROR TWELVE

**THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO PRECLUDE THE IMPOSITION OF THE DEATH PENALTY ON GROUNDS THAT THE INDICTMENT FAILED TO CONTAIN ANY ALLEGATIONS REGARDING THE PUNISHMENT SPECIAL ISSUE.** *(CR. I-142-46; RR. V-68).*

## ARGUMENT AND AUTHORITIES

The trial court also overruled Appellant's Motion to Declare *Article 37.071* Unconstitutional contending in part that the indictment was constitutionally defective because it did not allege aggravating factors or future dangerousness. *(CR. I-142-46; RR. V-68).* Defense counsel requested that the State be precluded from seeking the death penalty against Appellant because the indictment did not allege the existence of the statutory special issues and the supporting facts necessary to impose a death sentence in violation of Appellant's *Sixth Amendment* right to trial by jury. *Ring v Arizona, 536 U.S. 584 (2002)* teaches that capital defendants, no less than noncapital defendants, are entitled under *the Sixth Amendment* to a jury determination of any fact on which a legislature has conditioned an increase in the defendant's maximum punishment. Since the facts which were relied on in order to seek death against

81

Appellant were not contained in the indictment, and the statutory special issues, as stated elsewhere in this brief, were totally undefined for the jury, there can not in any way have been a meaningful jury verdict in this case in the sense that *Ring* requires.

Appellant is aware of the existence of adverse authority from this Court addressing this issue. *See, e.g., Perry v State, 158 S.W. 3d 438 (Tex. Crim. App. 2004); Woods v State, 152 S.W. 3d 121 (Tex. Crim. App. 2004); Rayford v State, 125 S.W. 3d 521, 533 (Tex. Crim. App. 2003),* but nonetheless contends that these issues merit the Court's reconsideration. *Boyce v State, No. 04-04-00267-CR (Tex. App. - - San Antonio, July 13, 2005) 2005 Tex. App. LEXIS 5395 (mem. op.) (Stone, J. concurring)* (noting this Court had not yet addressed the *Apprendi/BLAKELY* requirement that every fact legally essential to punishment be charged in the indictment and proven to a jury).

## POINT OF ERROR THIRTEEN

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE APPLICATION OF TEXAS' DEATH PENALTY SCHEME BECAUSE IT HAS BEEN ARBITRARILY IMPOSED IN VIOLATION OF *THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. (CR. I-147-50; RR. V-68-69).*

## ARGUMENT AND AUTHORITIES

The trial court overruled Appellant's Motion to Preclude the Death Penalty as a Sentencing Option on *Eighth Amendment* grounds. *(CR. I-147-50; RR. V-68-69).* In view of the many different capital sentencing schemes that have been in operation in Texas in the post-*Furman* era, the Texas death penalty has been arbitrarily imposed and thus, is unconstitutional under *the Eighth and Fourteenth Amendments.*

Of the many hundreds of persons sentenced to death in Texas since the "modern" capital sentencing statute was enacted, the vast majority were sentenced under jury instructions that simply tracked the unadorned "special issues" contained in the original version of *art. 37.071 (b) Tex. Crim. Proc. Code Ann. (Vernon 2009).* <u>See generally</u>, P.M. McClung, "Jury Charges for Texas

83

Criminal Practice" 75-78 (rev. ed. 1981).  After the landmark decision in *Penry*

*v Lynaugh, 492 U.S. 302 (1989) (overruled in part on other grounds),* however,

the consistency in Texas capital sentencing instructions quickly disappeared,

both as a result of legislative action and unsupervised judicial improvising by the

trial courts. *See generally, Peggy M. Tobolowsky, "What Hath Penry Wrought?:*

*Mitigating Circumstances and the Texas Death Penalty," 19 AMER. J. CRIM. L.*

*345 (1992).*  In 1991, the Texas Legislature enacted an amended, post-*Penry*

version of *art. 37.071,* which modified the "special issue" format.

Roughly speaking, the various types of Texas capital sentencing

instructions in the post-*Furman* era can be broken down into seven different

categories.

1.      The unadorned "special issues" in the pre-1991 version of *Article*

*37.071.*

2.      The 1991 amended version of the statute.

3.      The pre-1991 statute with an extra-statutory "Quinones"-type

instructions.

4.      The pre-1991 statute with an extra-stationary "Penry"-type "fourth

special issue."

5.     The pre-1991 statute with a "nullification' instruction.

6.     The pre-1991 statute in which "deliberately" is broadly defined.

7.     The 1993 version of the state as applied in all crimes committed on or before August 30, 1991.

In numerous cases, the United States Supreme Court has stated that it is "unwilling to say that there is any one right way for a State to set up its capital sentencing scheme." *Spaziano v Florida, 468 U.S. 447, 464 (1984)* (citing cases).  The Court has stated, however, that within a single state, there must be consistency in the treatment of capital defendants who are subject to the death penalty. *Id. at 460* ("If a state has determined that death should be an available punishment for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not)."

The above discussion of the various sentencing schemes concurrently in operation in Texas, "a distinct system," *Gregg v Georgia, 428 U.S. 153, 195 (1976),* amply demonstrate that the present Texas death penalty system is being implemented in an "arbitrary" manner.   At least even categories of similarly situated capital defendants have been treated disparately.

85

*Fetterly v Paskett,* 997 F. 2d 1295 (9th Cir. 1993), presents an analogous situation to the instant case. In that case, the Ninth Circuit condemned an instance of "Furman arbitrariness" within a single state's capital sentencing system. The Court's reasoning is cogent and should be applied to Texas' experience.

The bottom line is that Texas courts and the state Legislature, without any discernible rational basis, have haphazardly turned Texas' capital sentencing scheme into a patchwork quilt. Because similarly situated Texas capital defendants, including Appellant, have been unjustifiably sentenced to death under radically different sentencing schemes, this Court must vacate Appellant's death sentence.

The decision to which defendant is to be subjected to the death penalty prosecution varies from county to county in Texas. As a result, there are likely two hundred and fifty-four (254) different methods used to determine which cases shall be prosecuted as capital cases. Often the decision can turn on the county's willingness to fund the defense, the race of status of the defendant, or the age, sex, race, or status of the victim in the community.

The right to life is fundamental. *Furman v Georgia,* 408 U.S. 238, 259

86

*(1972).* The failure of the State to set forth uniform and specific standards to determine against whom a death sentence will be sought renders the penalty of death one that is wantonly and freakishly implied and that is prohibited by *the Eighth Amendment to the United States Constitution.*

The need for non-arbitrary standards in the application of the death penalty outweighs any benefits of unbounded prosecutorial discretion.

## POINT OF ERROR FOURTEEN

THE TEXAS DEATH PENALTY STATUTE VIOLATES THE JURY TRIAL GUARANTEE OF *THE FOURTEENTH AMENDMENT*, AS INTERPRETED IN *APPRENDI V NEW JERSEY*, *RING V ARIZONA*, *BLAKELY V WASHINGTON*, *UNITED STATES V BOOKER*, AND *CUNNINGHAM V CALIFORNIA* BY FAILING TO PLACE UPON THE STATE THE BURDEN OF PROVING BEYOND A REASONABLE DOUBT A NEGATIVE ANSWER TO THE MITIGATION SPECIAL ISSUE. *(CR. I-142-46; RR. V-68).*

## ARGUMENT AND AUTHORITIES

*The Sixth Amendment* guarantees a criminal defendant the right to a jury trial. *U.S. Const. Amend. VI.* Part and parcel to the right to jury trial guaranteed under *the Sixth Amendment* is the "companion right to have the jury verdict based on proof beyond a reasonable doubt." *Apprendi v New Jersey*, 530 U.S. 466, 478 (2000). *See also*, *United States v Booker*, 543 U.S. 220, 125 S. Ct. 738, 748 (2005) ("It has been settled throughout our history that the Constitution protects every criminal defendant 'against conviction *except upon proof beyond a reasonable doubt* of every fact necessary to constitute the crime with which he is charged.'") (emphasis added) (quoting *In re Winship*, 397 U.S.

88

*358, 364 (1970)).*  Those rights are applicable in state court proceedings via *the*

*Due Process Clause of the Fourteenth Amendment. E.g., Duncan v Louisiana,*

*391 U.S. 145, 155-56 (1968).*

The trial court denied Appellant's pretrial motion that the jury be instructed

that the burden of proof was on the State of Texas to show the absence of

sufficient mitigating factors to warrant a death sentence. *(RR. V-68).*  The United

States Supreme Court has squarely held that "[i]f a State makes an increase in

a defendant's authorized punishment contingent on a finding of a fact, that fact

– no matter how the State labels it – must be found by a jury beyond a

reasonable doubt." *Ring v Arizona, supra* (citing *Apprendi, 530 U.S. at 482-83).*

*See also, United States v Booker, 125 S. Ct. at 756* ("Any fact other than a prior

conviction which is necessary to support a sentence exceeding the maximum

authorized by the facts established by a . . . jury verdict must be . . .proved to a

jury *beyond a reasonable doubt."* (emphasis added)).  Texas' death penalty

statute does precisely what is proscribed by *the Sixth Amendment* as interpreted

in *Apprendi* and *Ring:*  it allows the State to obtain the death penalty based upon

a factual finding – lack of sufficient mitigation – without the jury having to find

89

that fact beyond a reasonable doubt.[19]

Under the Texas death penalty statute, the jury's verdict of guilty, standing alone, without further factual findings from the jury, will result in a life sentence. *Tex. Crim. Proc. Code Ann. art. 37.071 §2 (g) (Vernon 2009).* Further, even the jury's answers of "yes" to the first two special issues coupled with the guilty verdict, standing alone without a further factual finding on the mitigation issue, *could not* result in a death sentence. *Id.* In this manner, lack of adequate mitigation becomes the "functional equivalent of an element of a greater offense." *Ring, 122 S. Ct. at 2443; Apprendi, 530 U.S. at 494 n. 19.* Therefore, it must be proven by the State beyond a reasonable doubt. *Ring, 122 S. Ct. at 2439-40, 2443.*

In *Blakely v Washington, 542 U.S. 296 (2004)*, the defendant pleaded guilty and was convicted by a Washington trial court of the offense of second-degree kidnaping. *Blakely, 124 S. Ct. at 2534-35).* Under the applicable Washington statute, the statutory range of punishment was confinement not to exceed a term of years (120 months). *Id. at 2535.* However, under Washington's

---

[19]This Court considered and rejected this exact argument in *Jones v State, 119 S.W. 3d 766, 791 (Tex. Crim. App. 2003) cert denied, 542 U.S. 905 (2004),* holding there that *Apprendi* is applicable to *art. 37.071.*

90

Sentencing Reform Act, the defendant's offense carried a "standard range" of forty-nine to fifty-three months. *Id.* The judge could only impose a sentence outside of that "standard range," which was clearly within the "statutory range of punishment," upon making certain findings of fact. *Id.* After a hearing, the trial judge entered various findings of fact, determined that the defendant acted with "deliberate cruelty," and imposed a sentence of 90 months – within the "statutory range" of one hundred twenty months, but significantly longer than "the standard range" of forty-nine to fifty-three months. *Id. at 2535-36.*

The defendant appealed, claiming "that this sentencing procedure deprived him of his federal constitutional right to have a jury determine *beyond a reasonable doubt* all facts legally essential to his sentence." *Id. at 2536 (emphasis added).* Writing for a majority of the Court, Justice Scalia held that:

> Our precedents make clear, however, that the "statutory maximum for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. . .* In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," . .

. and the judge exceeds his proper authority.

*Id.* (citations omitted (emphasis in original).

In *California v Cunningham, 127 S. Ct. 856 (2007),* the Supreme Court struck down California sentencing law, holding it violated the *Sixth Amendment* by allowing for an upper term sentence in a triad sentence system if the trial judge found aggravated circumstances.

In *Booker,* the Supreme Court addressed the application of the reasoning of *Blakely* to federal sentencing practice under the United States Sentencing Guidelines. In finding that the Sentencing Guidelines scheme of sentence enhancements being found by a judge by a preponderance of the evidence is unconstitutional, this Court noted that,

> Our precedents, [as] we explained [in *Blakely],* make clear "that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."*

*Booker, 25 S. Ct. at 749* ( quoting *Blakely, 124 S. Ct. at 2537 (emphasis in original)*).

Under the Texas death penalty scheme, Appellant could *only* receive a death sentence if all twelve jurors unanimously agreed that the answer to the

mitigation issue was "no." *See, Tex. Crim. Proc. Code Ann. art. 37.071 §2 (f) (2), 2 (g) (Vernon 2010)* (jury must unanimously agree to answer mitigation question "no" and death sentence can only be imposed if they do so.

Because the negative answer to the mitigation issue was a fact finding that was required to impose a death sentence on Appellant, the lack of mitigating circumstances was a fact "which the law makes essential to the punishment. *Id.* Accordingly, *the Sixth and Fourteenth Amendments* as interpreted in *Apprendi, Ring, Blakely, and Cunningham* require that the negative answer to the mitigation question be proven by the State beyond a reasonable doubt. *E.g., Blakely, 124 S. Ct. at 2542* (every "element" the prosecutor can allege to enhance punishment is "an element that a defendant can threaten to contest at trial and make the prosecutor prove beyond a reasonable doubt);" *Blakely, 124 S. Ct. at 2543* ("As *Apprendi* held, every defendant has the right to insist that the prosecutor prove to a jury all facts legally essential to the punishment.);" *Ring, 536 U.S. at 602* ("If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact – no matter how the State labels it – must be found by a jury beyond a reasonable doubt)."

93

Regardless of whether there is no burden on the mitigation issue or if the burden is placed on the defendant, the statute is unconstitutional because it fails to place the burden on the State of proving a negative answer to the issue beyond a reasonable doubt. *E.g., Blakely, 124 S. Ct. at 2542; Ring, 536 U.S. at 602-03).*

## POINT OF ERROR FIFTEEN

APPELLANT'S RIGHTS UNDER *THE CONFRONTATION CLAUSE OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION* WERE VIOLATED WHEN THE MOTHER OF DECEDENT, ROSIE GONZALEZ, TESTIFIED TO INFORMATION PERTAINING TO AN EXTRANEOUS OFFENSE DURING THE PUNISHMENT STAGE OF HIS TRIAL. *(RR. XXXIV-25-28; XL-36-37, 66).*

## POINT OF ERROR SIXTEEN

APPELLANT'S RIGHTS UNDER *THE CONFRONTATION CLAUSE OF ARTICLE 1, §10 OF THE TEXAS CONSTITUTION* WERE VIOLATED WHEN THE MOTHER OF DECEDENT ROSIE GONZALEZ TESTIFIED TO INFORMATION PERTAINING TO AN EXTRANEOUS OFFENSE DURING THE PUNISHMENT STAGE OF HIS TRIAL. *(RR. XXXIV-25-28; XL-36-37, 66).*

## POINT OF ERROR SEVENTEEN

REVERSIBLE ERROR OCCURRED WHEN THE MOTHER OF DECEDENT ROSIE GONZALEZ TESTIFIED TO INFORMATION PERTAINING TO AN EXTRANEOUS OFFENSE DURING THE PUNISHMENT STAGE OF HIS TRIAL IN VIOLATION OF THE HEARSAY RULE. *(RR. XXXIV-25-28).*

## ARGUMENT AND AUTHORITIES

### A. The Facts

Virginia Sommers,[20] the mother of decedent Rosie Gonzalez, testified during the punishment phase of Appellant's trial that Appellant had committed a prior assault against her daughter that had occurred approximately six months prior to the present offense. *(RR. XXXIV-20-26)*. After describing her observations of her daughter's injuries as well as her actions while attempting to assist her daughter, Ms. Sommers related the following in pertinent part:

> Q. Did she get an emergency protective order?
>
> A. She did.
>
> Q. And what did that emergency protective order do?
>
> A. It kept Cedric Ricks from coming to her apartment or to school where the kids went to school, where I worked, or to our house. He couldn't come around us.
>
> Q. So was there - - was there - - was that an order issued by a court?

---

[20]Virginia Sommers is a pseudonym.

A.     Yes.

Q.     And basically ordering Cedric Ricks over here at the far end of the counsel table to stay away from your daughter?

A.     Yes.

Q.     Was she - - was he ordered to stay away from anyone else?

A.     Yes.  He was ordered to stay away from our house, our residence, the school, the boys, - -

Q.     So he was ordered to stay away - -

A.     - - and her work.  Also, he couldn't come to her work.

Q.     So he was ordered to stay away from her, from [James], from [Damien], and from [Thomas]?

A.     Yes.

Q.     And was he ordered to stay away from [Rosie's] apartment?

A.     Yes.

Q.     And her place of business?

97

A.      Everywhere.  Everywhere she went, he could not go.

Q.      The kids' school?

A.      Yes.

Q.      And your house?

A.      Yes.

Q.      And that was in November of 2012?

A.      Yes.

Q.      And I guess, eventually, they got - - they got back together; is that right?

A.      Yes, because he kept bothering her.  He kept talking to her, calling her and telling - -

[DEFENSE COUNSEL]:    Excuse me.  Excuse me.

I'm going to object to what somebody else has told this lady.  I understand it's hard, but she's been admonished by the Court.  I'd ask that the - - first of all, I'd object that it's nonresponsive and it's hearsay and it's confrontation.

THE COURT:        Sustained.

98

[DEFENSE COUNSEL]: I'd ask the jury be instructed to disregard.

THE COURT: Jury will disregard the last statement of the witness.

[DEFENSE COUNSEL]: A n d I ' d respectfully ask for a mistrial.

THE COURT: Denied.

*(RR. XXXIV-26-28).*

## B. The Law under the Federal and State Constitutions

"In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him." *U.S. Const. Amend. VI.* This procedural guarantee applies to all state prosecutions. *Pointer v Texas, 380 U.S. 400, 406 (1965).* For the testimonial statements of a witness who does not appear at trial to be admissible in any criminal prosecution, the witness must be unavailable to testify, and the defendant must have had a prior opportunity to cross-examine the witness. *Crawford v Washington, 541 U.S. 36, 68 (2004).* Whether a particular out-of-court statement is testimonial or not is "a question of law." *Langham v State, 305 S.W. 3d 568, 576 (Tex. Crim. App. 2010); De La Paz v State, 279 S.W. 3d 336, 343 (Tex. Crim. App. 2009).*

99

*Article I, §10 of the Tex. Const.* provides Texans with a similar protection to that afforded criminal defendants under *the Sixth Amendment:* "In all criminal prosecutions the accused shall. . .be confronted by the witnesses against him. . . ." The Court of Criminal Appeals has interpreted this constitutional provision to mean "that the witnesses on the part of the state shall be personally present when the accused is on trial, or that they shall be examined in his presence and be subject to cross-examination by him." *Garcia v State, 210 S.W. 2d 574, 578 (Tex. Crim. App. 1948); Kemper v State, 138 S.W. 1025, 1038, overruled in part by Robertson v State, 142 S.W. 533 (Tex. Crim. App. 1911).* As a result, the testimony of Ms. Sommers was error and it violated Appellant's rights under *art. I,§10 of the Tex. Const.*

Finally, because "[the] rights to confront and cross-examine witnesses . . .have long been recognized as essential to due process," *Chambers v Mississippi,410 U.S. 284, 294 (1973),* Appellant restates and adopts all arguments made under his *Sixth Amendment* right *supra*, except that Appellant now also makes these arguments under *the Due Process Clause of the Fourteenth Amendment to the U.S. Const.,* which provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

## C. <u>Harm Analysis</u>

Because the violation of Appellant's right to confront and cross-examine Rosie Gonzalez was a constitutional error, this Court must reverse the Judgment of Death unless the Court determines beyond a reasonable doubt that the error did not contribute to Appellant's punishment. *Tex. R. App. Proc. 44.2 (a).* "When determining whether erroneously admitted evidence is harmless beyond a reasonable doubt, the question is not whether sufficient evidence to convict existed without this evidence, but whether there is a reasonable possibility that the erroneously admitted evidence contributed to the verdict obtained." *<u>Jones v State</u>, 833 S.W. 2d 118, 127 (Tex. Crim. App. 1992) cert. denied, 507 U.S. 921 (1993).* Not only did Ms. Sommers' testimony violate Appellant's constitutionally guaranteed rights to confront and cross-examine the witnesses against him, it also contributed to his punishment, particularly in light of Appellant's testimony on direct examination. Appellant related that Rosie had posted his bond and had insisted that he come back to their apartment and help raise their son. The record reflects:

> Q. Okay. And so - - and [Rosie] helped you get out of jail, right?

A.      Well, I had - - I had $5,000 at home, so I told her where the money was, and she said, "Well, I got to get somebody to sign," because, in Illinois, it's a little different.  I mean, all you've got to do is go to the counter and give them the money, and you sign out.  But, here, you have to get a bail bondsman.  You have to - - you have to go through a lot more detail to get out of jail, so ...

Q.      So did Roxie help you get out of jail?

A.      Yes, sir.

Q.      Did y'all try to work things out?

A.      Yes, sir.  We - - we actually - - the appointment I made with [a therapist], I had to make another appointment, so I end up calling her back, and we made another appointment.  And then I had to get in touch with CPS, because they were calling.  So I went up there and saw them.  And that's when she said I saw them December 11th.  So December 12th, I actually jumped in the program, and I had to pay for that.  It was, like, $300.

*      *      *

Q.      Okay.  All right.  And so at some point - - she had a protective order.  She got a protective order, right?

102

A. Yes, sir.

Q. Okay. And at some point, did she allow you to come back and live with her?

A. I mean, as soon as I - - as soon as she picked me up from down here, I mean, I went straight back to the apartment.

*(RR. XL-36-37).*

On cross-examination Appellant elaborated what transpired between Rosie and

him:

Q. Well, let me - - let me answer it for you. It's [Rosie's] fault you violated that, right?

A. No. I mean, she wanted me there, and we - - she - - she - - she picked me up, and she said, "I don't want you to go anywhere else. I want you here."

*(RR. XL-66).*

Ms. Sommers' testimony of what her daughter allegedly told about

Appellant's actions directly contradict Appellant's testimony and frankly

everything else in the record that shows that Rosie wanted to reconcile with

Appellant. Everything else in the record supports this contention. Appellant

103

asserts that it reasonable to assume that such testimony contributed to his death sentence. As a result the trial court should have granted defense counsel's motion for mistrial.

### D. The testimony was hearsay

Appellant restates and adopts in this section all of the arguments and applications he made in the two previous points of error. However, now Appellant makes these arguments under *Tex. R. Evid. 802,* which provides, in relevant part, "Hearsay is not admissible except as provided by statute or these rules or by other rules prescribed pursuant to statutory authority." Whether an out-of-court statement is admissible under an exception to the general hearsay exclusion rule is a matter within the trial court's discretion. *Zuliani v State,* 97 *S.W. 3d 589, 595 (Tex. Crim. App. 2003).*

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Tex. R. Evid. 801 (d).* "In determining whether a trial court erred in admitting or excluding hearsay evidence . . . a reviewing court looks to see whether the trial court clearly abused its discretion; before the reviewing court may reverse the trial court's decision, it must find the trial court's ruling

was so clearly wrong as to lie outside the zone within which reasonable people might disagree." _Taylor v State_, 268 S.W. 3d 571, 579 (Tex. Crim. App. 2008). As the proponent of the evidence, the State had the burden to show that it was either not hearsay or was admissible under an exception to the rule against hearsay. _Willover v State_, 70 S.W. 3d 841, 845-46 (Tex. Crim. App. 2002) _(footnotes omitted)._ This it failed to do. Ms. Sommers' statements were inadmissible hearsay as indicative of the trial court's sustaining Appellant's objection because they were offered to prove the truth of the matter asserted.

The admission of otherwise inadmissible hearsay is not constitutional error. _West v State,_ 121 S.W. 3d 95, 104 (Tex. App. - - Fort Worth 2003, pet. ref'd). The requisite harm analysis is different. _Tex. Rule App. Proc. 44.2 (b)._ When evaluating the harm caused by erroneously admitted hearsay, a reviewing court "must deem the error harmless if, after reviewing the entire record, the court is reasonably assured the error did not influence the jury's verdict or had but a slight effect." _Davis v State,_ 268 S.W. 3d 683, 709 (Tex. App. - - Fort Worth 2008, pet. ref'd).

As stated above, the testimony was prejudicial and contradicted Appellant's assertions that the two were trying to reconcile their relationship.

The jury could have easily concluded because of such testimony that Appellant was lying on cross-examination. Therefore, it is reasonable to assume that the testimony contributed to the jury's verdict of death. As a result the trial court should have granted the defense motion for mistrial.

Appellant respectfully requests that this Court sustain points of error fifteen, sixteen, and seventeen, reverse the Judgment, and remand his case to the trial court with instructions that he be afforded a new punishment hearing.

## POINT OF ERROR EIGHTEEN

**THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED APPELLANT'S RIGHTS UNDER *THE CONFRONTATION CLAUSE OF THE UNITED STATES CONSTITUTION* BY PERMITTING THE SEXUAL ASSAULT NURSE EXAMINER TO TESTIFY TO STATEMENTS MADE BY ROSIE GONZALEZ REGARDING AN EXTRANEOUS OFFENSE ALLEGEDLY COMMITTED BY APPELLANT. *(RR. XXXV-11-20).***

## POINT OF ERROR NINETEEN

**THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED APPELLANT'S RIGHTS UNDER *ARTICLE 1, §10 OF THE TEXAS CONSTITUTION* BY PERMITTING THE SEXUAL ASSAULT NURSE EXAMINER TO TESTIFY TO STATEMENTS MADE BY ROSIE GONZALEZ REGARDING AN EXTRANEOUS OFFENSE ALLEGEDLY COMMITTED BY APPELLANT. *(RR. XXXV-11-20).***

## ARGUMENT AND AUTHORITIES

### A. The Facts

During the punishment phase of Appellant's trial the State called Sexual Assault Nurse Examiner Cynthia Crowe to testify to what Rosie Gonzalez had allegedly told her regarding an extraneous assault offense that Appellant had

allegedly committed on November 12, 2012, approximately six months before

the present offense.  The record reflects:

Q.     And did you ask Ms. Sanchez what brought her to the emergency room?

A.     Yes.

Q.     And what was her answer?

[DEFENSE COUNSEL]:    Y o u r Honor, I'm going - - that - - I'm going to have to object at this time.

May I take the witness on voir dire, Your Honor?

THE COURT:        You may.

VOIR DIRE EXAMINATION

BY [DEFENSE COUNSEL]:

Q.     Ms. Crowe?

A.     Uh-huh.

Q.     You said you work in the emergency room?

A.     Yes.

Q.     All right.  And this is at HEB hospital?

A.    Yes.

Q.    How many people do you see on a typical week at the emergency room?

*    *    *

A.    Probably hundreds.

Q.    A week?  Thousands a month?

A.    I mean, I haven't done the math.  If you've done the math, then that's correct.

Q.    You see a lot of people, is what I'm saying.

A.    Yes, I do.

Q.    Do you have an independent recollection of a person by the name of [Rosie Gonzalez]?

A.    No.

Q.    Okay.  So you have no independent recollection of this individual that we speak of?

A.    No.

Q.    Okay.

[DEFENSE COUNSEL]:    Your Honor,

109

I'm going to object. She has no independent recollection and can't remember. And it's also a confrontation issue, Sixth Amendment.

THE COURT:   Response.

[PROSECUTOR]   First of all, it's an exception to the hearsay rules, and it's not found - - it's not been found by the courts to be testimonial hearsay. It's nontestimonial hearsay, so it doesn't affect the confrontation clause. Second of all, she has a business record in front of her that she created, and we have previously given a copy to the Defense.

[DEFENSE COUNSEL]:   Judge, it is testimonial, because it's not some sort of response to police activity that's impending doom or an injury in nature. This lady works in a hospital. Somebody comes in and talks to her, and those items are protected under the confrontation clause. So we object on that basis.

THE COURT:   That objection is overruled.

[DEFENSE COUNSEL]:   Can we have a running objection?

THE COURT:   That's granted.

*(RR. XXXV-15-17).*

110

Ms. Crowe then related to the jury from her records what Ms. Gonzalez had told her happened during an extraneous assault which was a pending felony that Appellant had allegedly committed against her on November 12, 2012. The record reflects:

> Q. Okay. Ms. Crowe, I had asked you: You had asked [Ms. Gonzalez] what brought her to the emergency room that day. What was her response?
>
> A. Strangled last night and head was pounded on the floor.
>
> *    *    *
>
> Q. Did she indicate to you who had done that?
>
> A. I think, on the last page, it says, "Patient states boyfriend was arrested this morning, and it happened in Bedford."
>
> Q. Did you ask, during the course of your triage of [Ms. Gonzalez], whether or not there was domestic violence involved?
>
> A. Yes, I did.
>
> Q. And what was her response?
>
> A. She said yes.

111

Q.     Was she accompanied by anyone that morning?

A.     I documented that she was accompanied by a parent.

Q.     And based upon her - - her statements to you about what brought her to the emergency room, what type of - - what type of action did you take with regard to her case?

A.     Well, I triaged her, and I categorized her as a trauma, because she was an injury instead of a sickness.  And she reported she lost consciousness, so that was a priority two.

Q.     When a patient reports they lost consciousness, does that make it more serious to you as a triage nurse?

A.     It means they need to see the doctor more quickly.  So, yes, I guess it does.

Q.     Was she sent to a bed?

A.     She was put in a bed in the emergency room that had the capability for monitoring her.

Q.     You also judge the cases by the level of acuity?

A.     Uh - huh.

Q.     And what is that for the jury, please?

A.     Oh, that was category two, the level of acuity.

Q.     I'm having a little trouble hearing you.

A.     Oh, that was a category two, the level of acuity, because she lost consciousness.  So she needs to see the doctor sooner than later.

Q.     Where did she tell you she was hurting?

A.     Head and neck.

Q.     And do you, as a triage nurse, ask the patient to categorize their pain in any fashion?

A.     Yes.  One being minimal pain, ten being most possible pain, how much pain are in now?

Q.     And how did she categorize her pain?

A.     I put ten, so she told me ten.

Q.     You told us earlier how you

113

asked about the mechanism of injury. Did she tell you what the mechanism of injury was?

A. I put down, "I was choked until I passed out."

Q. So she told you she was choked?

\*     \*     \*

A. Yes.

Q. So was she referred to a doctor; is that correct?

A. I don't understand what you're asking me.

Q. Was she referred to a doctor?

A. Do you mean was she seen by a doctor in the back?

Q. Yes.

A. Yes.

Q. Do you know what further diagnosis they did of her?

A. I can - -

Q. Did they send her for additional

114

testing?

> A.    I think she got a head CT.

> A.    And what is that?

> A.    It's a X-ray that uses a computer. So it can see your bones, but it can also see your brain. So, like, if you had a brain bleed, that would show up on a head CT.

*(RR. XXXV-17-20).*

## B. Federal and State Constitutional Law

Appellant adopts the arguments made in points of error fifteen and sixteen, above. There should be no question that Rosie's alleged statements made to the Sexual Assault Nurse Examiner are testimonial. Since Ms. Crowe had no recollection of her patient, all anyone has is the notes that she took while performing her duties as a SANE. The interview was a custodial examination in preparation for possible testimony against Appellant in court. At the time of the present offense, a felony family violence assault case pertaining to this incident was pending against Appellant. *(RR. XL-34-36, 50-51).* Rosie Gonzalez was not personally present as a witness at Appellant's trial, nor was she examined in Appellant's presence and subject to cross-examination by him. Thus, it was error

115

to allow Ms. Crowe to testify to what Rosie had told her.  Appellant's rights under

*the Sixth Amendment to the U.S. Const. and art. 1,§ 10 of the Tex. Const.* were

clearly violated.  Appellant also asserts that the admission of this prejudicial

testimony contributed to the jury's death verdict.

Appellant requests this Court to sustain points of error eighteen and

nineteen, reverse the Judgment of Death, and remand his case to the trial court

with instructions that he be afforded a new punishment hearing.

## POINT OF ERROR TWENTY

**IF NONE OF APPELLANT'S POINTS OF ERROR ARE REVERSIBLE PER SE, THEN ALL OF THE ERRORS PRESENT CUMULATIVE ERROR REQUIRING REVERSAL WHEN CONSIDERED TOGETHER.** *(Record in its entirety).*

Appellant contends that if this Court finds that the trial court erred as argued in points of error one through nineteen and that each error was harmless, then the errors warrant reversal of the trial court's judgment when considered cumulatively. This Court, the Texas Supreme Court, and the United States Circuit Court of Appeals for the Fifth Circuit have all recognized that an aggregation of nonreversible errors, which are plain errors failing to necessitate reversal and harmless errors, can yield a result that amounts to the denial of the constitutional right to a fair trial, which calls for reversal. *See, e.g.*, *United States v Munoz*, 150 F. 3d 401, 418 (5th Cir. 1979) cert. denied, 25 U.S. 1112 (1999); *King v Federal Underwriters Exchange*, 144 Tex. 531, 191 S.W. 2d 855 (1946) (citing *Smerke v Office Equipment Co.*, 138 Tex. 236, 158 S.W. 2d 302 (1941); *Renn v State*, 495 S.W. 2d 922 (Tex. Crim. App. 1973).

In *Chamberlain v State*, 998 S.W. 2d 230, 238 (Tex. Crim. App. 1999)

117

*cert. denied, 528 U.S. 1082 (2000)* (citing *Stahl v State, 749 S.W. 2d 826, 832*

*(Tex. Crim. App. 1988)*) this Court acknowledged that it "is conceivable that a

number of errors may be found harmful in their cumulative effect. . ." Nine years

later, in *Gamboa v State, 296 S.W. 3d 574, 585 (Tex. Crim. App. 2009)* (citing

*Stahl at 832)* this Court recognized that "it is possible for a number of errors to

cumulatively rise to the point where they become harmful."

Even before *Chamberlain* was decided, at least one Court of Appeals had

held that, although "some errors are not considered reversible, all errors

considered together can present cumulative error requiring reversal." *Bott v Bott,*

*962 S.W. 2d 626, 631 (Tex. App. - - Houston [14th Dist.] 1997, no pet.)* (citing

*Pitman v Lightfoot, 937 S.W. 2d 496, 537 (Tex. App. - - San Antonio 1996, writ*

*denied); Klein v Sporting Goods, Inc., 772 S.W. 2d 173, 179 (Tex. App. - -*

*Houston [14th Dist.] 1989, writ denied).* Other Texas courts, including this one,

have reversed trial court judgments for cumulative error, without labeling it as

such, in cases of ineffective assistance of counsel. *Ex parte Welborn, 785 S.W.*

*2d 391, 396 (Tex. Crim. App. 1990)* ("Although, no one instance in the present

case standing alone is sufficient proof of ineffective assistance of counsel,

counsel's performance taken as a whole does compel such a holding."); *Brown*

*v State, 974 S.W. 2d 289, 294 (Tex. App. - - San Antonio 1998, pet. ref'd)* ("Not every allegation of ineffectiveness of counsel in this case would justify reversal. However, the totality of defense counsel's representation undermines this court's confidence in the conviction."); *Green v State, 899 S.W. 2d 245, 249 (Tex. App. - - San Antonio 1995, no pet.)* (holding that, while "not every shortcoming of defense counsel in this case would justify reversal. . .cumulatively, the errors totally undermine confidence in this conviction."); *Smith v State, 894 S.W. 2d 876, 880 (Tex. App. - - Amarillo 1995, pet. ref'd)* ("the combination of these circumstances verify that trial counsel's representation fell below an objective standard of reasonableness").

In this case, through cumulative error, the trial court violated Appellant's *Fourteenth Amendment* right to due process and a fair trial. The individual errors above involved matters of constitutional law and state law that so infected the entire trial that Appellant's conviction violates due process and a fair jury trial in violation of *the Sixth and Fourteenth Amendments to the U.S. Const. See, Derden v McNeel, 978 F. 2d 1453, 1457 (5th Cir. 1992) (en banc) cert. denied, 508 U.S. 960 (1993); Stahl v State at 831* (holding harm lies in the cumulative effect of a witness' outburst and prosecutor's improper arguments). As a result,

this Court should reverse the Judgment and remand Appellant's case back to the

trial court with instructions that he afforded a new trial. <u>See</u>, *Tex. Rule App. Proc.*

*43.2 (d); Tex. Crim. Proc. Code Ann. art. 44.29 (a) (Vernon Supp. 2012).*

## CONCLUSION AND PRAYER

Appellant respectfully prays that this Honorable Court sustain his first through fourteenth and his twentieth points of error, reverse the trial court's Judgment and sentence of Death, and remand his case back to the trial court with instructions that he receive a new trial. In the alternative, Appellant respectfully prays that this Honorable Court sustain fifteenth through nineteenth points of error, reverse the Judgment and Sentence of Death against him, and remand his case to the trial court with instructions that he be afforded a new sentencing hearing.

Respectfully submitted,


/s/ Mary B. Thornton
MARY B. THORNTON
Attorney for Appellant
3901 Race Street
Fort Worth, Texas 76111
Telephone No.: (817) 759-0400
Telecopier No.: (817) 831-3002
marybrabson01@gmail.com
State Bar No. 19713700

## STATEMENT OF COMPLIANCE WITH RULE 9.4 (i)(2)(B)

I certify that this brief contains 27,112 words, complying with *Rule 9.4 (i)(2)(B) of the Texas Rules of Appellate Procedure.*

/s/Mary B. Thornton
Mary B. Thornton

## CERTIFICATE OF SERVICE

A copy of Appellant's brief has been electronically served on the Hon. Debra Windsor, Chief of Post Conviction in the Tarrant County District Attorney's Office, Fourth Floor of the Tim Curry Criminal Justice Center, 401 West Belknap, Fort Worth, Texas 76196, at COAAppellateAlerts@tarrantcounty.com on the 3rd day of August, 2015.

/s/Mary B. Thornton
MARY B. THORNTON